A06A1817. STROUD v. THE STATE.
(644 SE2d 467)

PHIPPS, Judge.

Darrell Stroud was convicted of committing numerous sexual offenses against his stepdaughters, C. S. and her younger sister, Q. S., between November 9, 1995, and March 23, 2001. On appeal, he contends that the evidence was insufficient and that his trial counsel rendered ineffective assistance. Because Stroud has demonstrated no reversible error, we affirm.

The evidence showed that in 1996, when Q. S. was in nursery school, she complained to her aunt that her "bottom" was hurting. The aunt testified that Q. S. told her that Stroud had been "messing with her private areas." When Q. S.'s mother learned of the allegation, she asked Q. S. about it. Q. S. told her mother that it had not been Stroud, but a boy in her school. An ensuing police investigation into the matter concluded that the allegation regarding Stroud was unfounded.

In March 2001, when C. S. was in the fifth grade, she wrote a letter to her school principal, stating:

> I hat my stepdaddy. He thinks that he can beat on us. But we are going to get an atroney. But my grandmother is going to help us get out of this house. But well leave and live with my grandmother at her house. I will tell her that he raped me and he said if I said something about to anyone he will kill me. I would never tell nobodoy with my mouth. I will tell by letters and writing. If my mother trie to stop me. I will take matter and stop them. But most of them me and my sister will handuly them. But If I don't won't let us be use. But he want him to die cause he beats me and my sister and my mother want do nothing about it. . . .

The principal summoned a social worker. When questioned by the social worker, C. S. indicated that it was painful for her to speak about what was happening to her. Therefore, she instead wrote the principal another letter, stating, "He Raped! . . . When we were living in Oakland apartments in my room were apartment that was over thir by. a other set of apartments were. a my gread mothers house. nobody caus he say if I tell he will kill me, he did it."

Since the fall of the year before, the social worker had been working with the Department of Family and Children Services (DFCS) on a case involving C. S.'s family. According to the social worker, that case "involved an alleged sexual abuse, child molestation." In interviews with the social worker during those months, C. S. and Q. S. denied that they had been sexually abused. Only after writing the letters to her principal did C. S. reveal to the social worker that Stroud had been sexually abusing her. The social worker testified that she could not remember whether Q. S. ever personally told her of any sexual abuse.

The investigation into whether Stroud had sexually abused C. S. or Q. S. broadened. A police officer assigned to the case testified that Q. S. told her that Stroud had been sexually abusing her; the record is silent whether C. S. told the officer that Stroud had sexually abused her.

The DFCS referred the girls to Booker Poe, M.D., who saw them in March 2001. C. S. made claims of sexual abuse; Q. S. denied that she had been sexually abused. His physical examinations of the girls found no bruises or lacerations around their genital areas. He testified, however, that a child could be sexually abused and yet later have no physical manifestations of the abuse, depending on the type of abuse and the length of time that has passed since the abuse.

Psychotherapist Harriet Davis interviewed each girl in April 2001, and the video recordings of the interviews were played for the jury. C. S., then ten years old, told Davis she preferred to write, rather than speak, about some of the things Stroud had done to her. Then, either writing or speaking, C. S. related to Davis that during the last two years, Stroud had frequently touched her inappropriately when no other adult was around. C. S. stated that Stroud had raped her more than once. Defining "rape," C. S. wrote, "[H]e got on top of me and put his private in mine." C. S. clarified that she used "private" for his penis and for her vagina. She told that after putting his private into her private, Stroud would "move . . . side to side." C. S. said that she had seen something that looked like "white, thick milk" come out of Stroud's private. She stated that, sometimes, this substance would go "inside" her private and that "[w]hen he finish, I go to the bathroom; and that's when I see it." C. S. further stated that Stroud had rubbed her "behind" with his hands. On more than one occasion, Stroud had put Vaseline on his private and then put his private into her "behind." C. S. stated, "because it kept on slipping out," the "white, thick milk" substance from his private went "outside," not "inside," her "behind." C. S. stated that during the sexual episodes, Stroud's private sometimes changed: "It got longer; sometimes, it was shorter." C. S. told that to make it change, "He would play with it." She detailed, "He'll put his hand in his pants and make, and then, he'll

grab it, and then . . . he'll make his hand go up and down." C. S. stated that a few times Stroud made her put her mouth on his private; that he had "licked" her private; that he had "stuck" his "hand" in her private; and that he had placed his hands on her chest.

C. S. stated that she had not reported these acts by Stroud to her mother because she did not think her mother would believe her. She had remained silent also because Stroud had repeatedly threatened to kill her if she told anyone. But after the last episode in March 2001, C. S. told Davis, she gathered the courage to write a letter to her principal, whom she knew was her grandmother's friend.

Q. S., who was nine years old when interviewed by Davis, told the psychotherapist that when she was four years old, Stroud got on top of her and put his "frontside" into her "backside" and "moved up and down." She described that it was painful and that she told him to get off her, but "he didn't and he just kept on going." She stated that since that one episode, Stroud had not done anything sexual to her. However, she complained that he threw things at her and whipped her, leaving marks and scars on her body.

At trial, Davis testified as an expert in forensic interviewing and in the therapy and treatment of victims of child sexual abuse. She stated that she had conducted the girls' interviews based upon guidelines recommended by the American Professional Society on the Abuse of Children. Davis testified that disclosure of sexual abuse is often a process. Regarding children, she explained, "[A]s adults, we often expect a child's disclosure to be all at one time and in a certain order, and very clear when, in fact, it actually happens in stages." Further, she testified that a child may disclose a fact to one person, but not to another and that "it's very unusual that a child would make their first disclosure to their mom and even more so if the abuser is somebody that their mom cares about."

In May 2001, Randell Alexander, M.D. saw the girls. C. S. passively acknowledged that she was there because of allegations about sexual abuse. Q. S. was more talkative, however, and said that Stroud had touched her vaginal area during the summer of 2000, but that there had been no oral sex. Alexander's physical examination of the girls found no injuries, scarring, or abnormalities. At trial, Alexander testified as an expert in pediatrics and child abuse. He stated, "About 80 percent of children that we think have been sexually abused don't have scars or some sort of residuals that you can check out later on. There are about 20 percent who do." Alexander explained that "[i]f the children are fondled, there is not going to be any scars" and that

> some injuries, if they're real superficial, will heal. And if you're not there within days, they are going to heal up, and

you're not going to see anything on down the road. The genital area heals pretty well. . . . So depending on the child if someone is real careful, they can actually insert things pretty deep into the vagina and not necessarily damage the hymen.

Explaining why anal penetration might leave no permanent scar, Alexander testified, "[The anus is] a structure that will bend and heals really fast."

The girls' mother testified that, from the time of the 1996 allegation concerning Q. S., she constantly asked both girls whether Stroud was touching them inappropriately. They said that he was not. Nevertheless, the mother testified that on several occasions she was "uncomfortable" with the girls and Stroud lying in bed together to watch television. Describing one occasion involving Stroud and C. S., the mother recounted:

I was in the kitchen, and him and [C. S.] was in the bed, they was up under the covers; and the door was cracked, and I looked through the door, and I see movement under the covers. When I came through, both of them jumped. And I made [C. S.] go to her room.

C. S. told her mother that she and Stroud had been only looking at television and that they had "jumped" because she startled them when she entered the room. After charges were brought against Stroud, Q. S., but not C. S., told her mother that Stroud had sexually abused her.

C. S. was 13 years old when Stroud was brought to trial in January 2004. She testified that, several times from when she was about age four or five to age ten, Stroud put his penis in her vagina; put his penis inside her buttocks; and put his "hands" in her vagina. She testified that Stroud threatened to kill her if she told anyone about the sexual acts. With respect to counts pertaining to C. S., the jury found Stroud guilty of forcible rape; aggravated sexual battery, by penetrating her sex organ with his fingers; and two counts of aggravated child molestation, by placing his sex organ into her mouth and into her anus.

Q. S. was 12 years old at trial. She testified that, several times from when she was about age four to eight or nine, Stroud put his penis in her vagina, anus, and mouth. Q. S. testified that Stroud had sometimes put baby lotion or Vaseline on his penis. With respect to counts pertaining to Q. S., the jury found Stroud guilty of forcible rape; and two counts of aggravated child molestation, by placing his sex organ into her mouth and into her anus.

1. Stroud contends that the state failed to prove the element of force with regard to the rape of Q. S.

Stroud was charged under OCGA § 16-6-1 (a) (1), which defines rape as having "carnal knowledge of . . . [a] female forcibly and against her will." "[T]he term 'forcibly' means acts of physical force, threats of death or physical bodily harm, or mental coercion, such as intimidation."[1]

Q. S. testified that Stroud would take off her clothes, that it felt "nasty" when Stroud was touching her, and that she had not immediately told her mother about Stroud's acts because she "didn't want to be hurt . . . by what happened to [her]." She also testified that she and C. S. had once run away from home because of "[t]he way he was doing to us." And during her interview with Davis, she pointed to scars and marks on her body caused by her stepfather. This evidence was sufficient to establish that the act was committed forcibly against the child.[2]

2. Stroud contends that the state failed to prove venue.

> [V]enue in all criminal cases must be laid in the county in which the crime was allegedly committed. Venue is a jurisdictional fact, and is an essential element in proving that one is guilty of the crime charged. Like every other material allegation in the indictment, venue must be proved by the prosecution beyond a reasonable doubt.[3]

The state may establish venue by whatever means of proof are available to it, and it may use both direct and circumstantial evidence.[4]

Both C. S. and Q. S. stated that Stroud had committed the acts when they were living at one of their two homes. During the pertinent span of time, the girls, their mother, and Stroud resided first at the Oakland City Apartments, which the children's aunt testified was on Oakland Lane. The four of them later moved to 465 Holly Street. The Atlanta police officer who investigated the 2001 reports of Stroud's sexual misconduct testified that Oakland Lane and 465 Holly Street were in Fulton County. "As [Stroud] has offered no evidence to the contrary, we conclude that the [s]tate met its burden of proving

---

[1] *State v. Collins*, 270 Ga. 42, 43 (508 SE2d 390) (1998) (footnote omitted).

[2] See id.; *Spivey v. State*, 272 Ga. App. 224, 227 (1) (612 SE2d 65) (2005).

[3] *Jones v. State*, 272 Ga. 900, 901 (2) (537 SE2d 80) (2000) (punctuation and footnotes omitted).

[4] Id. at 902-903.

beyond a reasonable doubt that venue of the crimes charged is properly in Fulton County,"[5] the county in which Stroud was tried.

3. Stroud contends that the trial court erred in rejecting his claim of ineffective assistance of counsel.

To prevail on this contention, Stroud must establish, pursuant to *Strickland v. Washington*,[6] that his trial counsel's performance was deficient and that a reasonable probability exists that, but for the deficient performance, the trial would have had a different outcome.

> Both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact. In reviewing a trial court's determination regarding a claim of ineffective assistance of counsel, this court upholds the trial court's factual findings unless they are clearly erroneous; we review a trial court's legal conclusions de novo.[7]

We need not address both components of the *Strickland* test if the showing on one is insufficient; nor must we address the components in any particular order.[8]

(a) Stroud argues that trial counsel rendered ineffective assistance by failing to move to quash the indictment, asserting that it was subject to a special demurrer. He points out that each count of the indictment alleged a range of dates, between November 9, 1995 and March 23, 2001, rather than a specific date.

An indictment is subject to a special demurrer if it is not perfect in form or if the accused is entitled to more information.[9] Generally, an indictment that fails to allege a specific date on which the crime was committed is not perfect in form and is subject to a timely special demurrer.[10] But where the evidence does not permit the state to identify a single date on which an offense occurred, the indictment may allege instead that the offense occurred between two particular dates.[11] Where the exact date is not stated as a material allegation of the offense, it may be proved as of any time within the statute of limitation.[12]

---

[5] *Robinson v. State*, 275 Ga. 143, 144 (2) (561 SE2d 823) (2002); see *Henry v. State*, 278 Ga. 554, 555 (2) (604 SE2d 469) (2004).

[6] 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984).

[7] *Bruce v. State*, 268 Ga. App. 677, 679 (603 SE2d 33) (2004) (footnotes omitted).

[8] *Turner v. State*, 253 Ga. App. 760, 763 (6) (560 SE2d 539) (2002).

[9] *State v. Gamblin*, 251 Ga. App. 283 (1) (553 SE2d 866) (2001).

[10] Id.

[11] Id.

[12] *Hutton v. State*, 192 Ga. App. 239, 241 (4) (384 SE2d 446) (1989).

Stroud asserts he was prejudiced by the lack of specific dates because "it is possible that the Statute of Limitations barred some or all of the seven counts in the [indictment] as it is unclear whether a four (4) year Statute of Limitation would be applicable or a seven (7) year Statute of Limitations would apply to certain counts of the Bill of Indictment." OCGA § 17-3-1 provides the statute of limitation for each offense charged in the indictment.[13] While that Code section does provide for a four-year limitation period for certain felonies, it expressly excludes from that list "felonies committed against victims who are at the time of the commission of the offense under the age of 18,"[14] as well as, "crimes punishable by . . . life,"[15] such as rape.[16] For these crimes of which Stroud was found guilty, OCGA § 17-3-1 provided for at least a seven-year limitation period during the pertinent years.[17]

Moreover, the indictment, which was filed September 6, 2002 and alleged acts on or after November 9, 1995, was timely. The evidence showed that the offenses occurred within the alleged date range and within the governing statute of limitation. Stroud has not shown that the evidence permitted the state to allege a specific date for any of the charges, nor has he shown that the lack of specific dates in the indictment materially affected his ability to present a defense. Thus, we find no reasonable probability that but for Stroud's trial counsel's failure to move to quash the indictment, the outcome of his trial would have been different.[18]

(b) Stroud argues that defense counsel rendered ineffective assistance by failing to object when the trial court instructed the venire jury that the law presumed him to be guilty. The transcript reveals that during voir dire, defense counsel asked the venire jurors, "Do you understand that it is the law that the defendant is innocent until proven guilty beyond a reasonable doubt?" The court interjected:

---

[13] See *Tompkins v. State*, 265 Ga. App. 760, 764-765 (2) (b) (595 SE2d 599) (2004), rev'd on other grounds, 278 Ga. 857 (607 SE2d 891) (2005).

[14] OCGA § 17-3-1 (c).

[15] OCGA § 17-3-1 (b).

[16] OCGA § 16-6-1 (b) (punishment for rape includes life without parole and imprisonment for life).

[17] See *Tompkins*, 265 Ga. App. at 764-765; see further *State v. Barker*, 277 Ga. App. 84, 86 (2) (625 SE2d 500) (2005) (noting that in 1996, OCGA § 17-3-1 was amended to provide "that prosecution for the crime of forcible rape must be commenced within 15 years after the commission of the crime") (punctuation and footnote omitted).

[18] See *Gentry v. State*, 235 Ga. App. 328, 330 (4) (508 SE2d 671) (1998); *Hutton*, supra; see also *Wallace v. State*, 253 Ga. App. 220, 222-223 (3) (558 SE2d 773) (2002) (where appellant failed to show he was prejudiced by his attorney's failure to file a demurrer challenging the form of the indictment, the trial court properly overruled his claim of ineffective assistance of counsel).

That's not the law. . . . No, that's not the rule. The law, ladies and gentlemen, requires you to presume the defendant to be innocent until proven guilty. You don't really know whether he is guilty, but the law requires you to presume him guilty until you hear evidence sufficient to convince you beyond a reasonable doubt of his guilt.

After the jury was selected, the court excused it for the day. The next day, after the close of evidence, the court charged the jury:

the defendant is presumed to be innocent until proven guilty. The defendant enters upon the trial of the case with a presumption of innocence in his favor. This presumption remains with the defendant until it is overcome by the State with evidence that is sufficient to convince you beyond a reasonable doubt that the defendant is guilty of the offense charged.

At the hearing on motion for new trial, the judge, who had also presided over Stroud's trial, insisted that on "no occasion" would he instruct a jury to presume a defendant is guilty. He attributed the transcription showing otherwise to a typographical error or a slip of the tongue by him. Stroud's trial counsel testified that she had not heard the judge instruct the jury to presume Stroud was guilty.

But even if the transcription correctly recorded a slip of the trial judge's tongue during voir dire, in light of the evidence and the court's ample and correct instruction on the presumption of innocence in the final charge, we find that there is no reasonable probability that but for defense counsel's failure to object to the judge's misstatement during voir dire, the outcome of Stroud's trial would have been different.[19]

(c) Stroud argues that defense counsel rendered ineffective assistance by exercising peremptory strikes to remove two venire jurors, rather than moving the court to excuse them for cause. The first juror at issue revealed that she formed an opinion about the case when she first heard about it on television. She also revealed that her daughter had been date-raped and that her cousin had been sexually abused as a child. But upon further questioning by the prosecutor, she stated that she had served as a juror many times, that she understood that a juror's decision must be derived solely from evidence presented

---

[19] See *Brantley v. State*, 271 Ga. App. 733, 736 (1) (611 SE2d 71) (2005) (charge must be viewed as a whole to determine whether there is a reasonable possibility that the charge as given misled the jury, and the mere verbal inaccuracy resulting from a slip of the tongue which does not clearly mislead or confuse the jury is not reversible error).

during the trial, and that she would, "to the best of [her] ability," set aside her personal thoughts and decide the case solely on the evidence presented and the law charged. When the trial judge questioned her, she reiterated that she would "certainly attempt" to put aside her personal thoughts, stating, "I certainly understand the need for every individual to be given a fair trial and that means you look at the evidence impartially. . . ."

As for the second venire juror at issue, the transcript shows that she revealed that her cousin had been convicted of child molestation. However, she agreed that, to the best of her ability, she would decide the case on the evidence presented and the law charged. In answering questions posed by defense counsel, the juror affirmed that she would have an impartial view of the case, but also stated that "to a degree," her knowledge about her cousin's crime would affect her ability to do so.

"Before a juror can be disqualified for cause, it must be shown that an opinion held by the potential juror is so fixed and definite that the juror will be unable to set the opinion aside and decide the case based upon the evidence or the court's charge upon the evidence."[20] Whether to excuse a juror for cause lies within the sound discretion of the trial court,[21] which is "uniquely positioned to observe a potential juror's demeanor and thereby to evaluate his or her capacity to render an impartial verdict."[22]

Both the Supreme Court of Georgia and this court have held that a trial court is not obligated to strike for cause a prospective juror in every instance where such person expresses doubts about his or her impartiality or reservations about his or her ability to set aside personal experiences.[23] For example, in the murder case of *Johnson v. State*,[24] two family members of a prospective juror had been killed

---

[20] *Johnson v. State*, 262 Ga. 652, 653 (2) (424 SE2d 271) (1993) (citations omitted).

[21] *Hollis v. State*, 269 Ga. App. 159 (1) (603 SE2d 516) (2004).

[22] *Wilson v. State*, 271 Ga. 811, 816 (5) (a) (525 SE2d 339) (1999).

[23] See, e.g., *Johnson*, supra; *Raheem v. State*, 275 Ga. 87, 91 (6) (560 SE2d 680) (2002) (viewing juror's responses as a whole, trial court did not abuse its discretion in finding that the juror would remain impartial despite her past experience and her honestly expressed concerns about the possible impact of that past experience upon her deliberations); *Wilson*, supra at 815-816 (trial court did not abuse its discretion in finding that the juror was qualified, where juror stated his belief that 99.9 percent of criminal defendants were guilty, but also stated that he thought he could be fair); *Garland v. State*, 263 Ga. 495, 495-497 (1) (435 SE2d 431) (1993) (trial court had not abused its discretion in refusing to excuse for cause prospective juror in a child molestation case, where juror stated that she would have difficulty being impartial because she was pregnant and also had a friend whose children had been sexually abused and next stated that she would "try" to put aside her feelings and later that she would base her decision on the evidence).

[24] Supra at 652-653.

during the past several years.[25] The juror first expressed some doubt whether he could put those two incidents aside and be impartial, next stated that he could put those incidents from his mind and be impartial, and later vacillated concerning the effect that the two incidents might have upon him.[26] The Court acknowledged that the juror had expressed some reservations concerning his ability to put aside his personal experience, but concluded that the trial court had not abused its discretion by refusing to excuse the juror for cause.[27]

Similarly, in the child molestation case of *Hollis v. State*,[28] a prospective juror was acquainted with someone whose son had been brutally raped and murdered.[29] The juror revealed that he believed that the incident would affect him in deciding the case, but indicated that he would be able to listen to the evidence with an open mind.[30] This court concluded that the trial court had not abused its discretion in refusing to excuse the juror for cause.[31]

"In order for [Stroud] to carry his burden to show prejudice on [this] ineffectiveness claim, he had the burden to show at the motion for new trial hearing that, but for counsel's alleged errors, the trial court would have abused its discretion in failing to excuse the prospective juror[s] for cause."[32] Having examined the record, we conclude that Stroud failed to satisfy this burden.[33]

(d) Stroud argues that defense counsel rendered ineffective assistance by forbidding him to testify at trial.[34] At the hearing on his motion for new trial, Stroud testified that he wanted to testify at his trial, that he told his lawyer that he wanted to do so, that she refused to permit him to testify, and that he did not then know that it was his decision whether to testify. He stated that, had he been allowed to testify, he would have proclaimed, "I [am] innocent of the charges," given "specifics" to support that claim, and told of his good character.

According to Stroud's trial attorney, however, "Stroud did not want to testify." She recalled that, as the trial date approached, she formed the opinion that Stroud's defense was stronger without his

[25] Id. at 653.
[26] Id.
[27] Id.
[28] Supra.
[29] Id. at 159 (1).
[30] Id. at 160.
[31] Id. at 161.
[32] *Rickman v. State*, 277 Ga. 277, 281 (3) (587 SE2d 596) (2003) (footnote omitted).
[33] See id.; *Johnson*, supra; *Raheem*, supra; *Wilson*, supra; *Garland*, supra; *Hollis*, supra.
[34] See *Dewberry v. State*, 271 Ga. 624, 626 (2) (523 SE2d 26) (1999); *Morrison v. State*, 258 Ga. 683, 686 (3) (373 SE2d 506) (1988) (counsel has a duty to investigate and to provide informed legal advice to the client; after having been informed, the defendant, and not his attorney, makes the ultimate decision about whether to testify in his own behalf).

testimony. She testified that when she advised Stroud of her opinion, he in no way indicated that he wanted to testify. She testified that had Stroud expressed that he wanted to take the stand, she would have called him as a witness.

The trial court was authorized to conclude that Stroud elected not to testify, after his lawyer provided informed legal advice to him. Furthermore, Stroud failed to establish prejudice. At the hearing on the motion for new trial, Stroud presented no "specifics" to support his claim of innocence and no evidence showing his good character. And the record shows that the jury was adequately charged that Stroud had denied all charges. Stroud has established no reasonable likelihood that the outcome of his trial would have been different had he taken the stand.[35]

(e) Stroud argues that defense counsel rendered ineffective assistance because he did not object to the trial court's failure to define "foreign object" with respect to the offense of aggravated sexual battery.

Pursuant to OCGA § 16-6-22.2, "[a] person commits the offense of aggravated sexual battery when he intentionally penetrates with a foreign object the sexual organ or anus of another person without the consent of that person."[36] "For the purposes of this Code section, the term 'foreign object' means any article or instrument other than the sexual organ of a person."[37]

The trial court charged the jury that it could convict Stroud of aggravated sexual battery only if it found beyond a reasonable doubt that Stroud had committed this crime as alleged in the indictment. The indictment, which the court read to and sent out with the jury, charged that Stroud had committed this crime by penetrating C. S.'s sexual organ "with a foreign object, to wit: his fingers."[38] Under these circumstances, we find no reasonable probability that the outcome of Stroud's trial would have been different if the jury of ordinary intelligence had been separately charged on a definition of "foreign object."[39]

(f) Stroud argues that defense counsel rendered ineffective assistance by failing to object when he was not present during what he claims was a critical stage of his trial. During deliberation, the jury sent out a note, asking, "Does the clause for child molestation

---

[35] See *Sims v. State*, 278 Ga. 587, 591-592 (3) (d) (604 SE2d 799) (2004).

[36] OCGA § 16-6-22.2 (b).

[37] OCGA § 16-6-22.2 (a).

[38] See *Johnson v. State*, 276 Ga. 57, 58 (1) (573 SE2d 362) (2002) (a finger constitutes a "foreign object" for purposes of the offense of aggravated sexual battery).

[39] See *Springs v. Seese*, 274 Ga. 659, 662 (3) (558 SE2d 710) (2002); *Vanwinkle v. State*, 263 Ga. App. 19, 20-21 (587 SE2d 142) (2003).

'uncorroborated testimony of a child is enough' apply to charges # 1, # 2, # 3 [rape of Q. S., rape of C. S., and aggravated sexual battery of C. S., respectively]"? The judge wrote on the note, "Yes"; signed it; and sent the note back to the jury. The trial transcript does not reflect whether Stroud was present when the judge received and answered the note. Stroud's trial attorney testified at the motion for new trial hearing that he and Stroud "were sitting out there" when a deputy sheriff reported that the jury had a question for the court, but the attorney could not recollect what happened after that. Stroud testified that he was not aware of the note until he began preparing for the motion for new trial.

> The right to be present attaches at any stage of a criminal proceeding that is critical to its outcome if the defendant's presence would contribute to the fairness of the procedure. . . . [A] critical stage in a criminal prosecution is one in which a defendant's rights may be lost, defenses waived, privileges claimed or waived, or one in which the outcome of the case is substantially affected in some other way.[40]

Stroud asserts essentially that, outside his presence and without his waiver of the opportunity to be present, the court held a charge conference and then recharged the jury. He claims that prejudice must be presumed. But "a charge conference is not one of those proceedings at which a defendant has an unequivocal right to be present."[41] Furthermore, even "when a trial court improperly communicates with the jury outside the defendant's presence, the error can be harmless. . . ."[42] Because this is not a circumstance of constructive denial of counsel, Stroud must demonstrate actual prejudice.[43] But as Stroud had made no claim that the alleged impropriety changed the outcome of his trial in any way, this claim of ineffective assistance of counsel fails.[44]

(g) Stroud argues that trial counsel rendered ineffective assistance by not objecting to the court's instruction that jurors may not draw negative inferences from the fact that he did not testify in his

---

[40] *Huff v. State*, 274 Ga. 110, 111 (2) (549 SE2d 370) (2001) (citations and punctuation omitted).

[41] Id. at 111-112 (citations and punctuation omitted).

[42] *Smith v. State*, 272 Ga. 874, 876 (2) (536 SE2d 514) (2000) (footnote omitted).

[43] See generally *State v. Heath*, 277 Ga. 337 (588 SE2d 738) (2003) (clarifying circumstances under which a court may apply a presumption of prejudice in evaluating a claim of ineffective assistance of counsel); *Smith*, supra.

[44] See generally *Ford v. State*, 274 Ga. App. 695, 699 (2) (617 SE2d 262) (2005).

defense. Stroud's timely requested charge on this principle tracked the language set forth in the Suggested Pattern Jury Instructions.[45] While a defendant is not entitled to the exact language requested, the charge given should cover the principle adequately.[46]

In this case, the trial court charged:

> I further charge you, ladies and gentlemen, that a defendant in a criminal case is on no duty to present evidence tending to prove innocence, and it is not required to take the witness stand to testify in the case. If defendant elects not to testify to inference hurtful, harmful, or adverse to the defendant shall not be done by a jury nor shall such fact to be held against the defendant in any way.[47]

While this instruction clearly contains errors, we do not agree with Stroud that "this jury instruction makes absolutely no sense." Rather, we conclude that the whole of the cited language did convey to the jury that Stroud had no duty to present evidence of his innocence or to testify and that his election not to testify could not be held against him in any manner whatsoever.[48] Accordingly, we find no reasonable probability that the outcome of Stroud's trial would have been different but for the alleged deficiency.

(h) Stroud argues that his trial counsel rendered ineffective assistance by failing to object to improper remarks by the prosecutor during closing argument. Citing *Hunt v. State*,[49] Stroud asserts that the prosecutor impressed upon the jury that returning a not guilty verdict was tantamount to calling C. S. and Q. S. liars and suggested

---

[45] See Vol. II: Criminal Cases (3rd ed.), § 1.32.10 (Defendant's Failure to Testify) (setting forth pattern instruction on this principle: "If the defendant elects not to testify, no inference hurtful, harmful, or adverse to the defendant shall be drawn by the jury, nor shall such fact be held against the defendant in any way.").

[46] *Johnson*, supra at 60 (3).

[47] The state asserts in its brief, "In all likelihood, this is a transcription error." Any transcription error, however, might have been corrected pursuant to OCGA § 5-6-41 (f), which provides, "Where any party contends that the transcript or record does not truly or fully disclose what transpired in the trial court and the parties are unable to agree thereon, the trial court shall set the matter down for a hearing with notice to both parties and resolve the difference so as to make the record conform to the truth." See *Bates v. State*, 228 Ga. App. 140 (491 SE2d 200) (1997). The state cites no such correction. Compare *Clanton v. State*, 208 Ga. App. 669, 670 (2) (431 SE2d 453) (1993) (amended trial transcript was issued to correct a typographical error in the original transcript, which showed the instruction given was an accurate statement of the applicable law). We cannot reject what is shown by the transcript and put in its place the state's bare assertion of what occurred at trial.

[48] See *Brantley*, supra.

[49] 268 Ga. App. 568 (602 SE2d 312) (2004).

that it could ignore the court's charge.[50] He also claims that the prosecutor made a mockery of the criminal judicial system, stating that he was ashamed to be a part of it.[51]

In *Hunt*, we plainly instructed that it is inappropriate for a prosecutor to include remarks in closing argument that "could be construed as improperly suggesting to the jurors that they go beyond their role of reaching a verdict based solely on the law and the evidence, and that they instead consider a matter not in evidence — i.e., a consequence of a particular verdict that would be personal to the members of the jury."[52] Moreover, closing argument in the nature of negative characterizations of the criminal justice system "is not any reasonable and permissible inference to be drawn from the evidence adduced at trial and [is] disapprove[d]. . . . We find it unnecessary and undesirable for prosecutors to resort to such characterizations."[53] While a prosecutor "may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."[54]

We strongly condemn the remarks cited in this case. With no objection, the inappropriate remarks continued, and no curative instruction was given.[55] We agree with Stroud that counsel's failure

---

[50] E.g., Stroud points out that the prosecutor remarked, "[Y]ou can refuse to ignore everything that [the trial court] reads to you about the law. Because, if you believe those girls, he is guilty and that's it." Quoting this language in his brief, Stroud inserts "(sic)" after the word "refuse." Stroud also points out, e.g., that the prosecutor remarked:
> But you need to come back to these girls. Your decision has to come back to these girls, because if you find [Stroud] not guilty, what will you have said? That those girls lied? That they made the whole thing up? That they lied to the social worker? They lied to Harriet Davis? That they lied to their principal? That they lied to Dr. Alexander, and they lied to all of us? That's what you are saying if you find [Stroud] not guilty.

[51] E.g., Stroud points out that the prosecutor remarked:
> If you find [Stroud] not guilty, you are saying they made [the allegations] up for nothing. . . . That doesn't make sense. It just does not make any kind of sense that they put themselves through this for nothing. But that's what [Stroud] wants you to believe. That's what the defense wants you to believe, and that's what your legal system does, our wonderful legal system, of which, I guess, I am a part. I will humiliate the victims but protect the abusers, and then sit around and judge every little detail about the victims' lives. I am not proud to be an attorney right now, but it's what I do.

[52] Supra at 575 (5) (footnote omitted) (finding it was inappropriate for the prosecutor to tell the jurors that if they return a not guilty verdict then they must be prepared to look at the victims and call them liars).

[53] *Geoffrion v. State*, 224 Ga. App. 775, 780 (8) (c) (482 SE2d 450) (1997) (citation and punctuation omitted), overruled on other grounds, *Mullins v. State*, 270 Ga. 450, 451 (2) (511 SE2d 165) (1999).

[54] *Berger v. United States*, 295 U. S. 78, 88 (2) (55 SC 629, 79 LE 1314) (1935).

[55] We find that the improper remarks so overstepped the wide latitude afforded to prosecutors to argue inferences from the evidence, see *McClain v. State*, 267 Ga. 378, 383-384

to object was not reasonable trial strategy, as asserted by the state, but deficient performance.[56]

However, "that is not the end of the inquiry, for deficient performance, alone, does not amount to ineffective counsel. [Stroud] must establish that counsel's inaction was so prejudicial to his defense that, but for the deficiency, there was a reasonable probability that the outcome of the trial would have been different."[57] Stroud has not made this showing, given the overwhelming evidence against him.

C. S.'s trial testimony was consistent with her numerous pretrial claims of sexual abuse by Stroud to her principal, a social worker, a psychotherapist, and examining physicians. Moreover, in describing Stroud's sexual abuse to the psychotherapist, the then ten-year-old child gave contextual details that would not ordinarily be in such a young child's knowledge. Further, C. S.'s claims were corroborated by her mother's observation of "movement under the covers" of the bed wherein Stroud lay with the child, which "movement" abruptly halted when the child's mother unexpectedly entered the room.

There was also evidence that Stroud had committed the charged acts against Q. S. Although some of her pretrial statements were inconsistent with her trial testimony, there was expert testimony that a child may disclose sexual abuse to one person, but not to another and that a child's disclosure of sexual abuse "happens in stages." In addition, the evidence showed that, during the period in question, Stroud was sexually abusing C. S. in the family's home. While the medical examinations revealed no physical abnormality for either girl, evidence showed that the varying instances of sexual abuse occurred over a number of years, and expert medical testimony showed that it was not uncommon for sexual abuse to leave no permanent physical manifestations.

Given the evidence, there is no reasonable probability that the outcome of Stroud's trial would have been different had his trial counsel objected to the improper remarks.

*Judgment affirmed. Smith, P. J., and Ruffin, J., concur.*

---

(3) (b) (1) (477 SE2d 814) (1996), that it would have been appropriate for the trial court to take some sort of corrective action, even without objection. See generally *Medlock v. State*, 263 Ga. 246, 250 (4) (430 SE2d 754) (1993). OCGA § 17-8-75 provides:

> Where counsel in the hearing of the jury make statements of prejudicial matters which are not in evidence, it is the duty of the court to interpose and prevent the same. On objection made, the court shall also rebuke the counsel and by all needful and proper instructions to the jury endeavor to remove the improper impression from their minds; or, in his discretion, he may order a mistrial if the prosecuting attorney is the offender.

[56] See *Hunt*, supra.

[57] *Lloyd v. State*, 280 Ga. 187, 192 (2) (d) (ii) (625 SE2d 771) (2006) (citations omitted).

DECIDED MARCH 28, 2007 —

*Brian Steel*, for appellant.

*Paul L. Howard, Jr., District Attorney, Marc A. Mallon, Bettieanne C. Hart, Assistant District Attorneys*, for appellee.