## S90P1325. BROWN v. THE STATE.
(401 SE2d 492)

WELTNER, Justice.

This is a death penalty case. The crime occurred in 1975. The appellant, James Willie Brown, was found incompetent to stand trial until 1981, when he was tried, convicted and sentenced to death for

---

the murder of Brenda Watson. We affirmed, holding, inter alia, that Brown had failed to prove by a preponderance of the evidence that he was insane at the time of the crime. *Brown v. State*, 250 Ga. 66, 71-72 (295 SE2d 727) (1982). However, in 1988, a federal district court granted Brown's petition for writ of habeas corpus on two grounds relating to Brown's competence to stand trial. That order directed the state to make a "reliable determination" of Brown's competency before any retrial. See *Brown v. Kemp*, Case No. 1:88-cv-228-RCF (N. District Ga., decided September 30, 1988) (unpublished opinion).

The case was returned to Gwinnett County for a retrial. Brown was evaluated by two physicians, who concluded that Brown was competent to stand trial. A jury trial was impanelled to hear Brown's special plea of incompetence. See OCGA § 17-7-130. The special jury found him competent to stand trial, and, after further pretrial hearings, the case proceeded to the retrial of the case in chief. Brown again was found guilty of murder and sentenced to death. This is his appeal.[1]

1. In his 5th, 10th, 11th, 13th and 17th enumerations of error, Brown argues he has been denied a fair opportunity to prove his mental condition at the time of the crime because of delays between the time of the crime and the time of the retrial. The combined result of these delays and an alleged violation of *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963) at the first trial, he argues, have deprived him of expert testimony about his mental condition at the time of the crime that would be relevant to his insanity defense, and as mitigation.

As we noted in our earlier opinion, Brown has been evaluated and treated for mental problems since 1968, when he was arrested on various charges of robbery and assault. *Brown v. State*, supra, 250 Ga. at 67. He exhibited no signs of psychosis, however, until after his arrest in this case in 1975. A psychiatrist at Central State Hospital evaluated Brown and concluded that Brown was a paranoid schizophrenic, was psychotic, and was not competent to stand trial. Other evaluations followed. Brown was given medication appropriate to the treatment of schizophrenia, and in 1977 a psychiatrist at Central State Hospital concluded he was now competent to stand trial. Brown experienced new difficulties after being transferred to the Gwinnett County jail, and was returned to Central State Hospital. He remained

---

[1] The federal court granted habeas relief on September 30, 1988, and the case returned to Gwinnett Superior Court. A jury found Brown competent to stand trial on July 17, 1989. The case was tried February 5 through February 9, 1990, and the jury reached its sentencing verdict on the latter date. The defendant filed his motion for new trial on February 28, 1990. It was denied June 1, 1990. The case was docketed in this court July 10, 1990. Oral arguments were heard on October 9, 1990.

there until 1980, after a further finding of competence. In October of 1980, the jail administrator sent Brown to a local mental health clinic for evaluation after Brown wrote offensive letters to women inmates. The clinic psychiatrist evaluated Brown and concluded in a written report that Brown "needs treatment and does not seem to be able to stand trial." This report was not furnished to the jail personnel, and the prosecutor did not learn of the evaluation until after trial when the psychiatrist, testifying at a post-trial hearing, mentioned his earlier evaluation.

Brown again was evaluated soon before his 1981 trial by a psychologist who concluded that Brown was competent to stand trial. A special jury so found, and Brown was tried, convicted, and sentenced to death.

In 1988, the federal district court granted further habeas relief on two grounds: (1) the psychologist's evaluation was inadequate; and (2) the state violated *Brady v. Maryland*, supra, by failing to disclose to the defense the results of the clinic psychiatrist's 1980 evaluation.

2. (a) After the case returned to Gwinnett County, Brown was evaluated by his psychiatrist of choice, and by the psychiatrist chosen by the state. Both psychiatrists testified at Brown's competency trial, and both were of the opinion that Brown was, without question, competent to stand trial. According to them, Brown had not been treated or medicated since 1982 and showed no indication of any serious mental disorder. One witness testified that he was surprised to find Brown "in such a good remission," given the previous diagnoses of psychosis and paranoid schizophrenia, and his lack of medication since 1982. He suggested that the original diagnosis was incorrect and Brown had not been paranoid schizophrenic, but had a personality disorder that was aggravated by drug abuse. The state's witness agreed that Brown was in good mental condition. He testified that schizophrenia is "for the most part a lifelong illness with exacerbations of the illness . . . and remissions," and agreed with the district attorney that schizophrenia is generally a "degenerative type mental condition if left untreated," as Brown has been since 1982. He said:

> For an individual who was schizophrenic to go this period of time with no psychotic episodes, to show no residual level of schizophrenia, no blunting of the affect, no loss of energy, no loss of goal direction, no loosening of association . . . will be most unusual to say the least.

Expressing doubt that "schizophrenia is ever cured," the witness stated it is "highly unlikely" that Brown ever was schizophrenic; and that it is "not uncommon" for those who abuse hallucinogenic drugs "to go through periods where they have the same symptoms as a

schizophrenic." In his opinion, with the benefit of hindsight and observation of Brown's present and continuing good mental condition, Brown's previous mental condition was not paranoid schizophrenia, but "hallucinogen perception disorder" caused by his admitted frequent consumption of LSD between 1971 and 1975.

Brown did not present an insanity defense at the retrial, contending instead that he simply was not guilty. However, at the sentencing phase, two experts appeared on his behalf. One testified Brown was psychotic when he first examined him in June of 1975. He had no opinion about the defendant's sanity at the time of the crime, and suggested the stress of arrest could have triggered the defendant's psychosis. The other testified that when he examined the defendant in 1980, Brown was psychotic, but that he was now in complete remission.

The psychiatrist chosen by the state testified that the symptoms of post-hallucinogenic perceptual disorder were similar to schizophrenia. This fact, he testified, was unknown to psychiatric practitioners in 1975; that schizophrenia is a chronic, unrelenting disorder; and that he had never seen a schizophrenic with severe symptoms improve to the point of having no symptoms. In his opinion, Brown was never schizophrenic, but either had been malingering, or had suffered from post-hallucinogenic perceptual disorder.

(b) Whatever his mental condition during his first trial, it is abundantly clear that Brown has been mentally competent in the years since his first trial, and was competent at the time of the retrial.

3. Brown argues that the delay in trying his case has deprived him of an insanity defense and of evidence in mitigation. The delay between the time of the crime and the original trial was discussed in our previous opinion. *Brown*, supra, 250 Ga. at 73 (4). Whether or not Brown's incompetence to stand trial during that time was feigned or real, the delay was caused by nothing that the state may have done.

4. (a) Brown argues that the state's *Brady* violation at the first trial caused a loss of favorable evidence. The record showed that neither the prosecutor nor any law enforcement officer knew of the clinic psychiatrist's opinion (that in 1980 Brown was not competent to stand trial).

Under the 11th Circuit holding of *United States v. Meros*, 866 F2d 1304, 1309 (1989):

> *Brady* and its progeny apply to evidence possessed by a district's " 'prosecution team' which includes both investigative and prosecutorial personnel." [Cit.] *Brady*, then, applies only to information possessed by the prosecutor or anyone over whom he has authority.

A clinic psychiatrist who was unknown to the prosecution could not be characterized as part of the prosecution "team." Under the present interpretation of *Brady*, this could not constitute a *Brady* violation.

(b) Additionally, there is no reasonable likelihood that Brown has been prejudiced by the delay. As the state points out, Brown had been examined numerous times since May of 1975, and at no time — neither while he was supposedly incompetent, nor since he has recovered — has any mental health expert concluded that he was insane at the time of the crime.[2] There is nothing in the record to support a conclusion that Brown was deprived of expert testimony or other material evidence about his mental condition at the time of the crime as a result of the delays in the conclusion of the case.

5. (a) In his first and 16th enumerations of errors, Brown contends the court erred by allowing Brown's wife to invoke the marital privilege contained in OCGA § 24-9-23, and to refuse to testify on his behalf.

The relevant portion of OCGA § 24-9-23 provides:

(a) Husband and wife shall be competent but shall not be compellable to give evidence in any criminal proceeding *for or against* each other. [Emphasis supplied.]

(b) The privilege of refusing to testify belongs to the witness, not to the defendant. *James v. State*, 223 Ga. 677, 683 (157 SE2d 471) (1967). Compare *Trammel v. United States*, 445 U. S. 40 (100 SC 906, 63 LE2d 186) (1980). Here, the wife, after testifying at a pre-trial *Jackson-Denno* hearing, invoked the privilege and refused to testify at trial.

(c) Brown argues that his wife waived her privilege by testifying at the pre-trial hearing. It is clear from our previous cases that the privilege not to testify may be invoked by the witness spouse even if he or she has testified for or against the defendant spouse in a previous hearing. See *Wiseman v. State*, 249 Ga. 559 (3) (292 SE2d 670) (1982), and cases cited.

(d) Brown argues that while he remained married to his wife, the marriage was moribund and the privilege should not apply. The statute makes no such exception. The Maryland Court of Appeals, faced with a similar argument, held:

Absent a statutory provision to the contrary, application of the privilege does not depend upon the stability of the mar-

---

[2] We note that at the retrial, as at the original trial, the state offered non-expert testimony and evidence that strongly supports a conclusion that Brown was not insane at the time of the crime.

riage, either at the time of the communication or at the time the privilege is asserted. . . . In *People v. Fields*, [38 AD2d 231, 328 NYS2d 542 (1972)], the court rejected the argument that the privilege would not apply where the marital relationship no longer had a "genuine existence," citing the practical difficulty a trial judge would have in determining whether the marriage was viable. [*Coleman v. State*, 380 A2d 49 (1977), 98 ALR3d at 1281-82.]

There was no error.

(e) Finally, Brown argues that the statutory privilege must yield to his constitutional right to present evidence on his behalf. He relies upon *Bobo v. State*, 256 Ga. 357, 360 (3) (349 SE2d 690) (1986), where we held:

*[I]n a proper case* a witness' statutory privilege must give way where countervailing interests in the truth-seeking process demand such a result. [Emphasis in original.]

In order to abrogate the psychiatrist-patient privilege, the defendant must make a showing of necessity, that is, that the evidence in question is critical to his defense and that substantially similar evidence is unavailable to him.

Brown argues his wife would have testified that he returned home between 11:30 p.m. and 12:30 a.m. on the day of the murder, and could have testified favorably to him concerning his interrogation.

However, except for the unsupported assertion of his attorney, Brown has not shown that his wife could have testified about the time of his return home the evening of the murder. Moreover, the defendant could have introduced her *Jackson-Denno* testimony in evidence if he felt her testimony concerning the interrogation was important. See OCGA § 24-3-10; *Wiseman v. State*, 249 Ga. at 560. Brown has shown no necessity to abrogate the marital privilege.

6. (a) Anita Tucker testified at the sentencing phase of the trial about her conversations with the defendant before his first trial. See *Brown v. State*, supra, 250 Ga. at 69. Brown had advised her to "play crazy" and she would get a light sentence. She did not follow his advice and was sentenced to life imprisonment. After she was sentenced, he asked her about the outcome of her case. When she answered him, he said, "Well, I told you." The state asked the witness whether she had been promised any benefit in exchange for her testimony. She testified that she had not, and that she had completed serving her sentence "and successfully finished my parole."

Brown now contends her testimony "interjected the issue of pa-

role in the sentencing phase" in violation of the federal and state constitutions and OCGA § 17-8-76.

(b) Brown did not object to this testimony, and this contention is not preserved for review. Moreover, we are not aware of any constitutional proscription concerning "the issue of parole." Our statutory proscription is not of necessity implicated by a mere mention of the word "parole" during the presentation of evidence, particularly in reference to the parole of a witness.

7. (a) After 15 witnesses testified for the state, the trial court announced "as a matter of courtroom decorum" that the continual opening and closing of the door to the courtroom was noisy and distracting, and directed the bailiff to keep it locked except during breaks. Brown now contends this order denied him a public trial. See, e.g., *Waller v. Georgia*, 467 U. S. 39 (104 SC 2210, 81 LE2d 31) (1984).

(b) The precise extent the court may permit ingress and egress only at certain times during the trial is a matter we need not decide here. The defendant did not object at trial to any limitations on public access, and failed to preserve this issue for appeal. The public was not "barred" from Brown's trial.

8. The trial court did not err by applying to the retrial the amended version of OCGA § 17-7-171 instead of the version in effect at the time of the original trial. Cf. *Landers v. State*, 250 Ga. 501 (4) (299 SE2d 707) (1983). Because Brown's retrial occurred within the time provided by our speedy trial statute, OCGA § 17-7-171 (c), the lawyer who had represented Brown for a time following the grant of federal habeas corpus relief was not ineffective for failing to perfect a demand for speedy trial.

9. The trial court did not err by denying Brown's motion to recuse the entire office of the district attorney simply because the district attorney himself, who was a witness in the case, was disqualified. *Holiday v. State*, 258 Ga. 393 (9) (369 SE2d 241) (1988); *Frazier v. State*, 257 Ga. 690 (9) (362 SE2d 351) (1987).

10. (a) Brown contends his statements and evidence seized from his car and house should have been suppressed. The trial court conducted extensive evidentiary hearings on these claims. The court found that Brown was mentally competent and freely and voluntarily gave a statement to police on May 16, 1975, and found that the searches were conducted lawfully.

(b) These findings are not clearly erroneous. *Brown v. State*, 250 Ga. at 75 (8).

11. The court's instructions concerning voluntariness of confessions were taken verbatim from Brown's request to charge number 17. Brown may not now complain that these instructions were incomplete. *Jackson v. State*, 234 Ga. 549, 553 (216 SE2d 834) (1975).

12. For reasons stated in our previous opinion, the trial court did not err by admitting evidence of two extrinsic crimes committed by the defendant. *Brown v. State*, supra, 250 Ga. at 73 (5). See also *Isaacs v. State*, 259 Ga. 717 (16b) (386 SE2d 316) (1989).

13. The court's disqualifications of two prospective jurors were "within the deference due the trial judge's determination." *Jefferson v. State*, 256 Ga. 821, 824 (2) (353 SE2d 468) (1987). See *Wainwright v. Witt*, 469 U. S. 412 (105 SC 844, 83 LE2d 841) (1985).

14. (a) Brown contends that blacks were underrepresented on the Gwinnett County traverse jury list in effect at the time of his trial. He concedes the disparity is less than one-tenth of one percent according to the 1980 official census, but argues that the increase in the Gwinnett County black population since 1980 is not reflected on the jury list. He bases his argument on figures generated by the Atlanta Regional Commission, which show that between 1980 and 1988 the non-white population of Gwinnett County rose from 3.4% of the total to 6.1% of the total.

(b) Assuming, without deciding, that the Commission's figures are accurate and that a jury commission in exceptional circumstances might be authorized to prepare a jury list according to non-official population estimates, the figures provided by the Commission do not show the percentage of total population in Gwinnett County that is black. As we have held previously, it is inaccurate to compare the black percentage of the jury list to the non-white percentage of the population of the county. *Cook v. State*, 255 Ga. 565, 572 (340 SE2d 843) (1986).

Brown has failed to show significant underrepresentation.

15. (a) Brown contends that in a hearing immediately prior to trial to determine his competency, "the state in effect called appellant as a witness and compelled him to state for the record that he was competent," in violation of the Fifth Amendment.

(b) The record contradicts the factual predicate on which Brown bases his Fifth Amendment claim, as, at the hearing at issue, Brown was as a witness called by his own lawyer, and not by the state. There was no cross-examination by the state. Brown's 21st enumeration of error is without merit.

16. Brown did not object at trial to the testimony of his brother that, during a pre-trial telephone conversation, the defendant "rambled on about his retrial." There being no objection to this testimony, there is nothing to review.

17. There is no merit to Brown's 23rd enumeration of error, in which he contends that death by electrocution is unconstitutional.

18. In his 24th enumeration, Brown contends that his death sentence violates the state and federal constitutions, *Ford v. Wainwright*, 477 U. S. 399 (106 SC 2595, 91 LE2d 335) (1986) (prohibiting execu-

tion of insane persons) and OCGA § 17-10-60 (prohibiting execution of mentally incompetent persons). Because Brown clearly is not insane or mentally incompetent to be executed, this enumeration is without error.

19. Brown has made no showing that a law enforcement officer responsible for courtroom security and a state's witness had improper contacts with the jury.

20. The jury found the presence of three statutory aggravating circumstances: (1) OCGA § 17-10-30 (b) (1) (the offense of murder was committed by a person with a prior record of conviction for armed robbery), (2) OCGA § 17-10-30 (b) (2) (the offense of murder was committed while the offender was engaged in the commission of rape), and (3) OCGA § 17-10-30 (b) (7) (the offense of murder was outrageously and wantonly vile and horrible in that it involved "depravity of mind" and "torture to the victim prior to the death of the victim"). (The words within quotation marks are contained in the jury's verdict.) The evidence supports these findings. OCGA § 17-10-35 (c) (2).

21. We do not find that the death sentence was imposed under the influence of passion, prejudice or other arbitrary factor. OCGA § 17-10-35 (c) (1). The sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. OCGA § 17-10-35 (c) (3). See *Brown v. State*, supra, 250 Ga. at 76 (11).

*Judgment affirmed. All the Justices concur.*

### APPENDIX.

*Pitts v. State*, 259 Ga. 745 (386 SE2d 351) (1989); *Williams v. State*, 258 Ga. 281 (368 SE2d 742) (1988); *Ford v. State*, 255 Ga. 81 (335 SE2d 567) (1985); *Allen v. State*, 253 Ga. 390 (321 SE2d 710) (1984); *Finney v. State*, 253 Ga. 346 (320 SE2d 147) (1984); *High v. State*, 247 Ga. 289 (276 SE2d 5) (1981); *Justus v. State*, 247 Ga. 276 (276 SE2d 242) (1981); *Green v. State*, 246 Ga. 598 (272 SE2d 475) (1980); *Stevens v. State*, 245 Ga. 583 (266 SE2d 194) (1980); *Burger v. State*, 245 Ga. 458 (265 SE2d 796) (1980); *Hardy v. State*, 245 Ga. 272 (264 SE2d 209) (1980); *Gates v. State*, 244 Ga. 587 (261 SE2d 349) (1979); *Brooks v. State*, 244 Ga. 574 (261 SE2d 379) (1979); *Collins v. State*, 243 Ga. 291 (253 SE2d 729) (1979); *Ruffin v. State*, 243 Ga. 95 (252 SE2d 472) (1979); *Johnson v. State*, 242 Ga. 649 (250 SE2d 394) (1978); *Morgan v. State*, 241 Ga. 485 (246 SE2d 198) (1978); *Moore v. State*, 240 Ga. 807 (243 SE2d 1) (1978).

DECIDED FEBRUARY 21, 1991 —
RECONSIDERATION DENIED MARCH 27, 1991.

Lenzer & Lenzer, Robert W. Lenzer, Thomas P. Lenzer, Larry L. Duttweiler, for appellant.

Thomas C. Lawler III, District Attorney, Daniel J. Porter, Debra K. Turner, Assistant District Attorneys, Michael J. Bowers, Attorney General, Andrew S. Ree, for appellee.