## A08A1398. SMITH v. THE STATE.
### (670 SE2d 191)

PHIPPS, Judge.

Johnnie Edward Smith was charged with committing upon R. A.: kidnapping, aggravated sodomy involving his sex organs and her mouth, rape, aggravated assault with the intent to rape, and aggravated assault with a knife. A jury found him guilty of kidnapping and aggravated sodomy and not guilty of the remaining charges. Denied a new trial, Smith appeals, contending that the evidence was insufficient to sustain his kidnapping and aggravated sodomy convictions. In addition, Smith contends that the trial court erred by allowing impermissible testimony, by disallowing impeachment evidence, by failing to instruct the jury on similar transaction evidence; in instructing the jury during its final charge and on recharge; and by rejecting his claim of ineffective assistance of counsel. Smith also complains that jurors viewed him in custody and asserts that jurors had improper contact with R. A. and a victim's advocate. Because Smith has failed to demonstrate reversible error, we affirm.

The state's case showed that between 4:30 and 5:00 a.m. on Tuesday, August 19, 2003, R. A. left her home on Boxankle Road in Forsyth, Monroe County, for her approximately two-mile walk to her workplace. R. A. testified that a man she did not know and had never seen before grabbed her from behind, pressed a knife against her throat, and dragged her into a white truck. The man drove the truck down a wooded dirt road and parked in a secluded location. With the knife at R. A.'s throat, the man warned her that he would kill her if she did not do what he wanted. R. A. recalled, "He said that if he were to kill me that no one would ever find me because he had done this before and he can do it again." The man ordered R. A. to undress and perform oral sex on him; she complied. He also attempted sexual intercourse. R. A. described, "He had put me on top of him. And the steering wheel was in back of me, and he was in front of me." R. A. testified, "He had tried to go in me. And he got it in, but it wasn't working." R. A. testified that she tossed her sunglasses under the seat, hoping they would serve as evidence that she had been in the man's truck. During the episode, the man mentioned that he worked a labor job, and R. A. noted that a construction hard hat was in the truck. When the man drove R. A. back to her residence, she ran inside.

R. A.'s roommate testified that R. A. burst through the door, crying and hysterical. R. A. told her roommate what had happened, and police were summoned.

The Monroe County Sheriff's Office was dispatched at 6:36 a.m. A sheriff's office sexual assault investigator received a call at about 7:00 a.m. and went to interview R. A. He testified that she appeared

to have been crying for some time. R. A. reported to him what had happened, providing details about the attacker, his truck, its contents, their route, and destination.

By 8:00 a.m., R. A. had been taken to a hospital, where she gave her medical history. The emergency room doctor testified that R. A. was emotionally wrought. His physical examination of her body revealed contusions on her back. The doctor compiled a rape kit that included swabs from R. A.'s oral, vaginal, and anal cavities. The emergency room nurse testified that R. A. was crying and shaking. She also noted abrasions and bruises on R. A.'s back. Pictures taken at the hospital of R. A.'s injuries were later shown to the jury, and R. A. testified that she did not have the injuries depicted when she left her residence for work that morning.

Within a few days, the investigator learned that a worker at a local construction site, who drove a truck like that described by R. A., had not shown up for work the Tuesday morning in question. On Friday, the investigator followed up on this lead by going to a particular restaurant at the time the possible suspect was expected to meet his foreman to pick up his earned pay. At the designated time, two men arrived at the restaurant's parking lot in a truck matching the description previously provided by R. A. The officer approached the driver, later identified as Smith; advised him that he was investigating rape allegations; and described the complainant and underlying particulars, including the alleged time and place. Smith responded, "I wasn't even in town," and handed the investigator a cash register receipt.

The investigator noted that the receipt was from a truck stop in another town, Jackson, that it was dated for that Tuesday, and that it was time-stamped at 7:00 a.m. The investigator also noted that Smith's physical appearance was consistent with characteristics of the attacker as related by R. A. A consent search of Smith's truck yielded sunglasses (later identified as R. A.'s), a knife, and a construction hard hat — all of which corresponded to various details reported to the investigator by R. A. The investigator asked Smith to come to the sheriff's office for further questioning, and Smith agreed.

A video recording of Smith's interview at the sheriff's office was played for the jury. Smith revealed that he had been to the town of Forsyth for the first time the previous week to begin a construction job. He had driven back to his hometown in Hall County for the weekend and returned to Forsyth on Sunday for that week's work. That Tuesday morning, however, he had driven back home because the pay and job duties were not as he had been promised. Smith denied that the woman described by the investigator had been in his truck, and he denied that he had engaged in sexual activity with any

woman while in Forsyth. He said he had not known of any sunglasses in the truck and claimed that the knife found belonged to the passenger who had been in his truck when he was approached by the investigator in the restaurant's parking lot.

After the interview, Smith was formally arrested. His photograph was taken. Pursuant to a warrant, his blood was drawn for DNA testing. In a subsequent photographic lineup and at trial, R. A. identified Smith as her attacker. Forensic biologists testified as state expert witnesses that the swab of R. A.'s rectal cavity contained sperm and that DNA found on that swab matched DNA from Smith's blood sample.

At trial, Smith was the only defense witness. He denied abducting R. A., assaulting her with a knife, verbally threatening her, and forcing upon her sexual activity. Smith maintained that the knife was not his, and at one point, insinuated that the search of his truck had begun before he consented to it.

Smith admitted, however, that he was with R. A. the Tuesday morning in question, claiming that she had willingly gotten into his truck and consented to their sexual activity. Smith testified that he had stated otherwise during his police interview because the kidnapping and rape allegations had frightened him.

Smith gave an account of how he had met R. A., how they had spent time together, and how she had met his nephew. He testified that he had met R. A. his first week in Forsyth. He and his nephew had traveled together from their hometown in Hall County to Forsyth for construction work; the two were lodging at the same motel on nights prior to work days. Before daybreak on that Friday, Smith was driving alone when he saw R. A. standing on the side of Boxankle Road. It was raining; he offered her a ride; she accepted; and as they rode together, they talked about their backgrounds and agreed to meet again the next week when he would return to town. Smith and his nephew left town Friday and returned together the following Sunday. As planned, early the following Monday morning, Smith picked up R. A. at the same location. After a brief stop at a Shell gas station, Smith parked a short distance away, where R. A. performed oral sex on him in exchange for money. Smith and R. A. then went to the motel, where Smith told his nephew that he would be late for work because he had to drive R. A. to her job. Smith then drove R. A. to work, before going to work himself.

The next morning, the Tuesday in question, Smith picked up R. A. at the same location and about the same time. They decided that neither would go to work that day. As they spent time together, R. A. continued to share her "life history." Smith testified that because it was foggy and R. A. "[knew] where she was going," he pulled over and allowed her to drive his truck, where after she drove

off the road, parked the vehicle, told him she wanted to make some money, and then performed oral sex on him. According to Smith, R. A. had hoped to have "oral sex and sex, too," but he "couldn't perform," and after an attempt at sexual intercourse, he drove R. A. home.

Having reached R. A.'s residence, Smith paid R. A. money for the oral sex, but refused her demand for additional money for sexual intercourse. R. A. retorted, "I'll get it one way or another," got out of the truck, and slammed its door. Smith testified that he then drove to his hometown because the job duties and pay in Forsyth were not as he had been promised. When he reached his hometown of Gainesville, he called his nephew and offered to drive back to Forsyth to get him.

Smith testified that while he was being held in jail on the charges underlying this case, he wrote his nephew letters asking him to testify at trial that he had seen R. A. with him that Monday morning at the motel. The nephew did testify at Smith's trial, but as a witness for the state. The nephew confirmed that he had received Smith's letters asking him to testify that he had met R. A. But, the nephew testified, he had never met R. A. and therefore turned over Smith's letters to the state because Smith was seeking perjured testimony.

According to Smith, however, the nephew's testimony mischaracterized his intent in writing the letters. Smith testified that his nephew had used the letters to garner favor with the district attorney in a county wherein he (the nephew) was facing unrelated charges.

1. Smith contends the evidence was insufficient to support his convictions of aggravated sodomy and kidnapping.

> The standard of review for sufficiency of the evidence is set out in *Jackson v. Virginia*.[1] The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. In addition, appellant no longer enjoys a presumption of innocence. An appellate court determines only the legal sufficiency of the evidence adduced below and does not weigh the evidence or assess the credibility of the witnesses.[2]

---

[1] 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[2] *Davis v. State*, 270 Ga. App. 777 (1) (607 SE2d 924) (2004) (citation omitted).

(a) Under OCGA § 16-6-2, "[a] person commits the offense of sodomy when he or she performs or submits to any sexual act involving the sex organs of one person and the mouth or anus of another";[3] "[a] person commits the offense of aggravated sodomy when he or she commits sodomy with force and against the will of the other person."[4] Smith argues that there was no showing of force, asserting that there was no evidence that he struck R. A. However, there was evidence that R. A. suffered bruises, contusions, and abrasions during her encounter with Smith. Furthermore, R. A. testified that she submitted to Smith's demand for oral sex because she believed that if she did not, he would kill her, which, in light of evidence of Smith's actions and threats, constituted a reasonable fear.[5] Contrary to Smith's contention, the evidence was sufficient to support his aggravated sodomy conviction.

(b) Pursuant to OCGA § 16-5-40 (a), "[a] person commits the offense of kidnapping when he abducts or steals away any person without lawful authority or warrant and holds such person against [her] will." Smith asserts that the state's case contained inconsistencies and weaknesses, while his testimony about what happened during his encounter(s) with R. A. showed that she had willingly joined him and engaged in sexual activity. But the credibility of witnesses and any evidentiary inconsistencies were matters for the jury to resolve.[6] "[W]e do not speculate which evidence the jury chose to believe or disbelieve."[7] Rather, where as here, there is some competent evidence to support each fact necessary to make out the state's case, we must uphold the jury's verdict.[8]

2. Smith contends that his nephew's testimony concerning the contents of the letters violated the best evidence rule,[9] arguing that the testimony was not the best evidence of his statements therein and pointing out that the letters were not introduced in evidence. The "'best evidence rule' applies only . . . where the contents of the writings are in issue."[10] Here, there was no contest concerning the

---

[3] OCGA § 16-6-2 (a) (1).

[4] OCGA § 16-6-2 (a) (2).

[5] See *Thompson v. Stinson*, 279 Ga. 196, 197 (611 SE2d 29) (2005).

[6] *Rankin v. State*, 278 Ga. 704, 705 (606 SE2d 269) (2004); *Chappell v. State*, 183 Ga. App. 706, 707 (359 SE2d 686) (1987).

[7] *Watson v. State*, 235 Ga. App. 381, 384 (1) (509 SE2d 87) (1998) (citation and punctuation omitted).

[8] *Rankin*, supra.

[9] OCGA § 24-5-4 (pertinently providing, the "best evidence which exists of a writing sought to be proved shall be produced, unless its absence shall be satisfactorily accounted for" and "[w]ritten evidence of a writing is considered of higher proof than oral evidence").

[10] *Pryor v. State*, 238 Ga. 698, 707 (9) (234 SE2d 918) (1977), overruled on other grounds in *Drinkard v. Walker*, 281 Ga. 211, 217 (636 SE2d 530) (2006) and overruled on other grounds, *Montes v. State*, 262 Ga. 473, 474-475 (421 SE2d 710) (1992).

contents of the letter. According to both Smith and his nephew, the letters pertinently contained Smith's request for his nephew to testify that he (the nephew) had met R. A. What *was* contested was whether the nephew had, in fact, met R. A. And while the letters were not made a part of the record before us, there is no assertion that they would have shed light on that issue. This contention is without merit.[11]

3. Smith contends that the trial court erred by disallowing evidence to impeach R. A.[12]

To discredit R. A.'s claim that she did not know and had never seen Smith before that Tuesday, Smith sought to show that he and R. A. had enjoyed a personal relationship prior to that date by testifying that she had confided in him that she had suffered a miscarriage. The prosecutor objected that the testimony was barred by the rape shield statute,[13] asserting that Smith was seeking to impugn R. A.'s character with "the fact that she is [a] 19-year-old child who has had a prior miscarriage." The prosecutor attributed Smith's knowledge thereof to the defense having had pretrial access to the state's file, which contained R. A.'s medical records documenting a prior miscarriage.

The rape shield statute "is a strong legislative attempt to protect the victim-prosecutrix in rape cases by the exclusion of evidence which might reflect on the character of the witness without contributing materially to the issue of the guilt or innocence of the accused."[14] Thus, except under circumstances not shown to exist here,[15] the rape shield statute bars "evidence relating to the past sexual behavior of the complaining witness."[16] The statute's nonexhaustive list of what constitutes evidence of "past sexual behavior" includes the complaining witness's "general reputation for promiscuity, nonchastity, or sexual mores contrary to the community standards."[17] The trial court did not abuse its discretion by excluding as barred by the rape shield statute evidence of R. A.'s prior miscarriage.[18]

---

[11] See *Pryor*, supra; *Parham v. State*, 275 Ga. App. 528, 531 (3) (621 SE2d 532) (2005).

[12] See *Hicks v. State*, 222 Ga. App. 828, 829 (1) (476 SE2d 101) (1996) (whether to allow testimony concerning a rape victim's prior sexual history is in the court's discretion).

[13] See OCGA § 24-2-3.

[14] *Harris v. State*, 257 Ga. 666, 667 (1) (a) (362 SE2d 211) (1987) (citation and punctuation omitted).

[15] See OCGA § 24-2-3 (b).

[16] OCGA § 24-2-3 (a).

[17] Id.

[18] See *Murrell v. Ricks*, 280 Ga. 427, 428-429 (627 SE2d 546) (2006) (evidence of past or present venereal disease that might have been sexually transmitted was inadmissible); *Harris*, supra (evidence that victim was a prostitute related to her sexual behavior and was

4. Smith contends that the trial court erred by allowing the state to recall a law enforcement officer who participated in the truck search to testify that the truck was not searched until after Smith consented. Contrary to Smith's assertion, the complained-of testimony did not constitute improper bolstering.[19] It was permissibly offered to rebut an assertion that Smith made while testifying in his own defense.[20]

5. Characterizing as similar transaction evidence R. A.'s testimony that Smith warned her that he had committed crimes before, Smith contends that the trial court erred by failing to charge the jury on the limited purpose of similar transaction evidence.[21] But no such limiting instruction was required here because testimony concerning Smith's threats was admissible as direct evidence to prove elements of the charges against him.[22]

6. Smith contends that the court erred when instructing the jury on aggravated sodomy during its final charge.

(a) Smith complains, and the transcript shows, that in reading to the jury the aggravated sodomy count of the indictment, the trial court mistakenly said "in" instead of "and," to wit:

Count three of the bill of indictment reads as follows: And the grand jurors in the name and behalf of the citizens of Georgia charge and accuse Johnny [sic] Edward Smith of the offense of aggravated sodomy, in that the said accused in the state and county aforesaid on the 19th day of August, 2003, did then and there unlawfully submit to a sexual act

---

inadmissible); *Hicks*, supra at 829-830 (portions of a conversation between appellant and victim prior to and during course of alleged criminal acts were inadmissible under rape shield statute, notwithstanding appellant's claims that the evidence could have created an impression of implied consent); cf. *Richardson v. State*, 276 Ga. 639, 640 (1) (581 SE2d 528) (2003) (evidence that the victim merely has or had a romantic relationship with another man does not reflect on her character for sexual behavior); *Banks v. State*, 185 Ga. App. 851, 853 (2) (366 SE2d 228) (1988) (testimony that victim was "going steady" did not open the door to introduction by defense of evidence of her past sexual experience).

[19] See *Buice v. State*, 239 Ga. App. 52, 55 (2) (520 SE2d 258) (1999) (a witness's credibility may not be bolstered by the opinion of another, even an expert, as to whether the witness is telling the truth), aff'd on other grounds, 272 Ga. 323 (528 SE2d 788) (2000); *McClain v. State*, 226 Ga. App. 714, 718 (3) (487 SE2d 471) (1997) (improper bolstering refers to character evidence intended to show a witness's veracity).

[20] See generally *Rayo-Leon v. State*, 281 Ga. App. 74, 76 (2) (635 SE2d 368) (2006).

[21] See generally *Lowery v. State*, 282 Ga. 68, 70 (3) (646 SE2d 67) (2007) (concerning limited purposes of similar transaction evidence and limiting instructions thereon); *Sedlak v. State*, 275 Ga. 746, 751 (2) (e) (571 SE2d 721) (2002) (the better practice is to charge the jury correctly and completely on the admissibility of similar transaction evidence and the specific limited purpose for which it may be considered).

[22] See, e.g., Division 1 (a), supra; see generally *Nance v. State*, 280 Ga. 125, 131 (10) (623 SE2d 470) (2005) (where evidence was not admitted as a similar transaction, no limiting instruction was required).

> involving sex organs of the accused *in* the mouth of [R. A.]
> by forcing said [R. A.] to place her mouth upon the penis of
> said accused, said act being done with force and against the
> will of said [R. A.], in violation of OCGA § 16-6-2, contrary
> to the laws of said state and peace, good order, and dignity
> thereof.[23]

We disagree with Smith that the use of the word "in" created such
an explicit picture that the misreading tainted the jury. We also
disagree with Smith that misreading that word of the indictment
constituted an improper comment on the evidence in violation of
OCGA § 17-8-57. Considering the charge as a whole, we are satisfied
that the jury could not have been misled or confused by the trial
court's minor slip of the tongue and conclude that the singular use of
"in" instead of "and" constituted harmless error.[24]

(b) Smith argues that the trial court erred in defining aggravated
sodomy, asserting that the court's definition deviated from the
indictment and permitted the jury to find him guilty of that crime in
a manner not alleged. The court defined, "[A] person commits the
offense of aggravated sodomy when that person performs or submits
to a sexual act of one involving the sexual organs of one in the mouth
*and/or anus* of another with force and against the will of the
victim."[25] Smith claims that, given the DNA evidence identified from
the rectal swab, a reasonable probability exists that the jury con-
victed him of aggravated sodomy for participating in a sexual act
involving his sex organs and R. A.'s anus.[26]

Giving a jury instruction that deviates from the indictment
"violates due process where there is evidence to support a conviction
on the unalleged manner of committing the crime *and the jury is not
instructed to limit its consideration to the manner specified in the
indictment.*"[27] The aggravated sodomy count of the indictment
charged Smith with "forcing [R. A.] to place her mouth upon the
penis of said accused, said act being done with force and against the
will of [R. A.]." At the start of its final charge, the trial court read to
the jury each count of the indictment. It informed the jury that the
state had the burden of proving beyond a reasonable doubt "every
material allegation of the indictment." After the final charge, the
court sent the indictment out with the jury for its use during
deliberations. Under these circumstances, there is no reasonable

---

[23] (Emphasis supplied.)

[24] See *Arnold v. State*, 271 Ga. 780, 782 (523 SE2d 14) (1999).

[25] (Emphasis supplied.)

[26] See OCGA § 16-6-2 (defining aggravated sodomy).

[27] See *Arnold*, supra (citation and punctuation omitted; emphasis in original).

probability that the jury could have convicted Smith of aggravated sodomy in a manner not alleged in the indictment.[28] No reversible error occurred.[29]

7. Smith contends that the trial court erred in recharging the jury on kidnapping. In response to the jury's request for a definition of kidnapping during its deliberations, the court instructed:

> A person commits kidnapping when that person abducts or steals away any person without lawful authority or warrant and holds such person against such person's will. To prove abduction, the State must prove the element of asportation. Asportation means carrying away. Only the slightest ele- ments — oh, I'm sorry, only the slightest movement of the victim is required to constitute the necessary element of asportation.

We find no error in this instruction, which tracked the applicable pattern jury instruction.[30] Smith's assertion in his appellate brief that the record fails to show what the court actually instructed and that subpoenaing a juror would reveal error is unavailing.[31]

8. Smith complains that jurors viewed him in custody. At the motion for new trial hearing, Smith testified that jurors had seen him arrive in a police car, dressed in street clothes, but handcuffed. The trial transcript reveals that Smith's lawyer reported to the court, "Smith has indicated that yesterday and today coming and going from the court the jurors have been present while he is being transported, that some of the jurors may have seen him being escorted by the deputies." The lawyer thus requested that "Smith be allowed to wait — or at least in the back five or ten minutes to give a reasonable time for the jurors to leave." The court responded that it would do so, and there is no assertion that the court thereafter did not.

Smith's complaint to this court that such setting may have cast aspersions upon him falls short of showing reversible error by the trial court. We have held:

---

[28] See *Hammonds v. State*, 263 Ga. App. 5, 7 (2) (587 SE2d 161) (2003).
[29] See id.
[30] See OCGA § 16-5-40 (a) (defining kidnapping); Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 2.26.30 (concerning kidnapping).
[31] See *Benton v. State*, 286 Ga. App. 736 (649 SE2d 793) (2007) (an appellant bears the burden of showing error affirmatively by the record, and if the transcript does not fully disclose what transpired at trial, it is the duty of the complaining party to complete the record pursuant to OCGA § 5-6-41 (f)).

> Although a defendant has the right to be free of the atmosphere of partiality created by the use of excessive guards or shackles in the courtroom, the mere fact of seeing an indicted accused in custody — not in the courtroom, as in the instant case, is not grounds for an automatic mistrial, but is addressed to the sound discretion of the trial court.[32]

Accordingly, we discern no abuse of discretion here, where the trial court granted the relief requested by the defense.[33] Furthermore, at the motion for new trial hearing, Smith called no juror to demonstrate prejudice.[34]

9. Smith contends that R. A. and a victim's advocate "had contact" with jurors. Smith testified at the motion for new trial hearing that, during a closing argument, a juror requested a restroom break, and the judge suspended the argument, excusing that juror and further instructing that, "If anybody else needs to take a break, you're free to go to the jury room right now and come right back." Smith testified that, next, the victim's advocate approached the prosecutor and said something to him; that the prosecutor nodded; and that the victim's advocate then walked to R. A., grabbed her hand, and walked out "with the jurors." Smith asserts that "she" (without clarifying whether referring to R. A. or the victim's advocate) must have said something to the jurors while they were out of the courtroom because when the jurors, R. A., and the victim's advocate returned to the courtroom, the jurors would not look at him.

Smith cites *Greer v. Thompson*[35] for the proposition that "where an unauthorized communication to a juror occurs in a criminal case, there is a presumption of harm and the burden is on the State to show the lack thereof."[36] Despite Smith's suspicion, he has not shown any unauthorized communication.[37] Smith called no juror at the motion for new trial hearing, and the victim's advocate testified that she had no recollection of the occasion. What is more, Smith has not shown that he requested any action by the trial court based upon what he now characterizes as "suspicious" conduct. A defendant

---

[32] *Hill v. State*, 193 Ga. App. 401, 405 (8) (387 SE2d 910) (1989) (citations and punctuation omitted).

[33] See *Lyon v. State*, 262 Ga. 247, 248-249 (3) (a) (416 SE2d 523) (1992) (trial judge's ruling will not be reversed for not going further than requested).

[34] See, e.g., *Hill*, supra (jurors were questioned to determine whether any observation affected their impartiality).

[35] 281 Ga. 419 (637 SE2d 698) (2006).

[36] Id. at 421.

[37] See *Brown v. State*, 261 Ga. 66, 74 (19) (401 SE2d 492) (1991); *Howard v. State*, 262 Ga. App. 198, 200-201 (4) (585 SE2d 164) (2003).

may not observe what he thinks is an injustice, "fail to bring this to the judge's attention at a time when corrective action may be had, take a chance on a favorable verdict, and then when the verdict is unfavorable have a mistrial or new trial because of [what he observed]."[38]

10. Smith contends that the trial court erred in rejecting his claim that his trial counsel was ineffective.

> To prevail on such claim, a defendant must establish, pursuant to *Strickland v. Washington*,[39] that counsel's performance was deficient and that the deficient performance was prejudicial to his defense. A court addressing the ineffective assistance issue is not required to approach the inquiry in that order or even to address both components if the defendant has made an insufficient showing on one. Both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact. Moreover, the defendant must overcome the strong presumption that his attorney's performance fell within a wide range of reasonable professional conduct and that the attorney's decisions were made in the exercise of reasonable professional judgment. The reasonableness of the conduct is viewed at the time of trial and under the circumstances of the case. In reviewing a trial court's determination regarding a claim of ineffective assistance of counsel, this court upholds the trial court's factual findings unless they are clearly erroneous; we review a trial court's legal conclusions de novo.[40]

(a) Smith argues that his trial counsel's failure to adequately investigate his case resulted in the absence of exculpating evidence.

(i) Smith complains that his trial lawyer failed to follow up on a Georgia Bureau of Investigation report provided to his lawyer that showed tire impressions down the dirt road that did not match the treads of his truck tires. But as Smith's trial lawyer testified at the motion for new trial hearing, Smith's defense was that his encounter and sexual activity with R. A. had been consensual. Because no part of Smith's defense relied upon a showing that he was not with R. A., his trial counsel did not perform deficiently by not investigating any

---

[38] *Foster v. State*, 255 Ga. 425, 426 (2) (339 SE2d 256) (1986); see *Painter v. State*, 237 Ga. 30, 33 (226 SE2d 578) (1976).

[39] 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984).

[40] *Espinosa v. State*, 285 Ga. App. 69, 72 (2) (645 SE2d 529) (2007) (footnotes omitted).

mismatch between tire impressions found on the dirt road and the treads of Smith's truck tires.

(ii) Smith complains that his trial lawyer did not obtain surveillance videotapes from a certain Shell gas station, asserting that such recordings would have shown that R. A. was voluntarily with him the day before the crimes underlying this case. Smith's trial lawyer testified at the motion for new trial hearing that Smith did not inform him that he and R. A. had stopped at a Shell gas station until about four or five months after the incident. The lawyer recounted, "I didn't follow up on that because most gas stations don't keep video tapes for more than thirty days." And at the motion for new trial hearing, Smith did not provide any evidence that the gas station had recorded the particular area of the property where he allegedly was with R. A. or that such recording was in existence several months later when he recalled to his lawyer that he and R. A. had been there together. With no such showing, Smith has failed to establish that his trial lawyer performed deficiently.[41]

(iii) Smith complains that his trial lawyer did not obtain certain of R. A.'s work time cards, asserting that they would have supported his testimony that the two had been spending time together. But neither did Smith present any such documentary evidence at the motion for new trial hearing. "[T]he purported documents are not part of the record, so it is impossible for us to determine if they actually would have helped his defense."[42] Smith has thus failed to establish that his trial lawyer performed deficiently.

(iv) Smith complains that his trial lawyer failed to present testimony of individuals he claims witnessed R. A. driving his truck that Tuesday morning. The lawyer acknowledged at the motion for new trial hearing that Smith had told him that they (Smith and R. A.) had passed a white van with a ladder or some other structure attached to its top, that several occupants of the van had seen R. A. driving his truck, and that he (Smith) believed that the occupants were construction workers. But because Smith could provide no additional distinguishing details about either the van or its occupants, counsel did not attempt to find such potential witnesses. At the motion for new trial hearing, Smith failed to present any such witnesses and consequently "has not shown who these witnesses were or what their testimony would have been. Without such showing, we cannot evaluate whether the failure to call the witnesses

[41] *Duitsman v. State*, 217 Ga. App. 435, 437 (1) (457 SE2d 702) (1995) (merely postulating the existence of exculpatory evidence is insufficient to show trial counsel performed deficiently).

[42] *Smith v. State*, 282 Ga. App. 339, 346 (4) (638 SE2d 791) (2006) (citation and punctuation omitted).

was deficient or whether their testimony might have changed the outcome of the case."[43]

(b) Smith argues that his trial lawyer performed deficiently by failing to object to the prosecutor asking R. A. leading questions. While the trial transcript reveals that the lawyer did so object, Smith's trial lawyer acknowledged at the motion for new trial hearing that, as a matter of trial strategy, he had allowed the prosecutor some latitude in asking leading questions. The lawyer recalled that when R. A. walked into the courtroom, she "came across [as] relatively frail" and appeared "victimized." The attorney thus determined that if he "jumped all over" her or the prosecutor or was otherwise perceived by the jurors as too aggressive, he likely would create resentment among them against the defense. Trial counsel's decisions and conduct related to this matter was not deficient performance, but was within the realm of reasonable professional judgment.[44]

(c) There is no merit in Smith's argument that his trial lawyer performed deficiently by failing to introduce evidence to impeach R. A. with her history of having had a miscarriage.[45]

(d) Smith argues that his trial lawyer performed deficiently by "stipulat[ing] to [the] State's position after objection regarding" threats he made to R. A. The trial transcript reveals that Smith's lawyer objected to R. A.'s testimony detailing Smith's threats to her — that he would kill her if she did not do what he wanted and that no one would find her body because he had done "this" before and could do "it" again. The attorney argued that the testimony showed prior crimes and thus impermissibly put his client's character in evidence. Countering the objection, the prosecutor cited several cases and argued that R. A.'s testimony of Smith's threats during their encounter was admissible as part of the res gestae of the crimes. Smith's lawyer responded, "I objected to preserve Mr. Smith's right for appeal on the record. But [the prosecutor's] case law is on point."

"Evidence which is relevant to an issue in a case is not rendered inadmissible by the fact that it incidentally puts the defendant's character at issue."[46] In this case, Smith's threats to R. A. constituted direct evidence of various elements of the charges underlying

[43] *Hinkle v. State*, 282 Ga. App. 328, 329 (1) (638 SE2d 781) (2006) (citation omitted).

[44] See *Fairclough v. State*, 276 Ga. 602, 605 (4) (581 SE2d 3) (2003) (determining the extent of examination is a strategic and tactical decision within the exclusive province of the attorney after consultation with the client).

[45] See Division 3, supra.

[46] *Jones v. State*, 280 Ga. 205, 206-207 (2) (a) (625 SE2d 1) (2005) (citations and punctuation omitted).

this case. Therefore, such evidence was not rendered inadmissible merely because it incidentally put Smith's character at issue.[47] Smith's trial lawyer did not perform deficiently by noting that case law appeared to support the state's position,[48] but nonetheless preserving the issue for appeal.

(e) Smith argues that his trial lawyer performed deficiently by failing to pursue motions to suppress evidence. When a trial lawyer's failure to pursue a motion to suppress is the basis for a claim of ineffective assistance, "the defendant must make a strong showing that the damaging evidence would have been suppressed had counsel made the motion."[49]

(i) Smith complains that his trial lawyer withdrew a motion for a *Jackson v. Denno* hearing to suppress his videotaped police statement. Smith has made no strong showing, however, that the statement would have been suppressed. The trial evidence reflected that the investigator informed Smith of his *Miranda* rights, that Smith waived same, that Smith was lucid, that the investigator engaged in no coercive behavior, that the investigator made no promises or threats during the interview process, and that Smith's statements were given freely and voluntarily. Smith has not shown deficient performance.[50]

(ii) Smith complains that his trial lawyer withdrew a motion to suppress evidence found in his truck, asserting that testimony from the passenger in his truck on the day it was searched would have shown that the search was without his consent. But at the motion for new trial hearing, Smith did not call the passenger as a witness. Furthermore, the state's rebuttal witness at trial testified that the search was conducted after Smith consented. And although Smith insinuated during his trial testimony that the search had begun before he consented, he also testified to the contrary. In addition, Smith testified that, when the investigator asked for his consent, "I told him to go ahead. I [had] nothing to hide." This record falls short of a strong showing that any motion to suppress would have been granted.[51]

(f) Smith argues that his trial lawyer performed deficiently by failing to seek state funds for an expert to challenge the DNA evidence presented by the state's experts. Again, Smith made no

---

[47] See *Collins v. State*, 273 Ga. 30, 31-32 (2) (538 SE2d 34) (2000).

[48] See generally *Woods v. State*, 271 Ga. 452, 454 (2) (c) (519 SE2d 918) (1999) (there is no deficient performance when an attorney fails to object to admissible evidence).

[49] *Richardson v. State*, 276 Ga. 548, 553 (3) (580 SE2d 224) (2003).

[50] See *Roberts v. State*, 263 Ga. 807, 810 (2) (e) (439 SE2d 911) (1994); *Davis v. State*, 267 Ga. App. 245, 246 (2) (599 SE2d 237) (2004).

[51] See *Richardson*, supra.

proffer at the motion for new trial of what a different expert would have discovered and testified. Absent such a proffer, Smith cannot show that his trial lawyer performed deficiently.[52]

(g) Smith argues that his trial lawyer performed deficiently by failing to move for a mistrial when the investigator testified that he (Smith) did not have a valid driver's license and had "other problems." The following transpired when defense counsel cross-examined the investigator regarding the circumstances surrounding Smith's agreeing to go to the sheriff's office for further questioning:

> Q: Was he free to leave? I mean did you arrest him or did you just say, hey, can we go down to [the sheriff's office] and talk, rather than talk here at the [restaurant]?
>
> A: That's how I put it to him. Yes, sir. I don't know if I would say that I would have let him leave. At that point I had also found out he didn't have any driver's license and a couple of other problems where he couldn't leave. But that's pretty much how I put it to him is, will you talk to me at the . . . Sheriff's Office.

Asserting that the response injected his character in evidence, Smith argues that he was entitled to a mistrial under *Chavous v. State*.[53] In that case, this court determined that the trial court did not err by granting a mistrial where a law enforcement officer, who had actively participated in an extensive discussion concerning the permissible scope of his testimony, violated the trial court's explicit admonishment not to refer to the defendant's prior criminal history.[54]

In this case, however, no such hearing was conducted concerning the permissible scope of the investigator's testimony, and the complained-of testimony was not in violation of any admonishment of the trial court. Under the circumstances here, where there was no reasonable probability that a request for a mistrial would have been granted,[55] trial counsel's failure to request one did not constitute deficient performance.[56]

(h) Smith argues that his trial lawyer performed deficiently by failing to request a continuance in light of "surprise" testimony by

---

[52] *Cupe v. State*, 253 Ga. App. 851, 856-857 (3) (e) (560 SE2d 700) (2002).

[53] 205 Ga. App. 455 (422 SE2d 327) (1992).

[54] Id. at 456-457 (2).

[55] See *Isaac v. State*, 269 Ga. 875, 877-878 (5) (505 SE2d 480) (1998); see generally *Hunter v. State*, 281 Ga. 526, 530 (3) (640 SE2d 271) (2007) (given the trial court's prompt and pointed curative instruction and given that the improper reference was inadvertent, the trial court did not abuse its discretion in denying the motion for mistrial).

[56] *Martin v. State*, 268 Ga. 682, 686 (10) (492 SE2d 225) (1997).

his nephew. Smith asserts that his nephew changed his account the day before trial and further posits that, had his trial lawyer requested a continuance, the defense "likely would have had an opportunity to exclude the letter which was admitted during his testimony and prevent his testimony."

The record does not support Smith's assertions that any letter was admitted, that his nephew "changed" his account the day before trial, or that a continuance would have led to a basis for excluding evidence about any letter. On motion for new trial, Smith's trial lawyer testified that about two weeks before trial, Smith named his nephew as a witness who would corroborate his defense. But the lawyer learned later that the nephew had no testimony that would aid Smith and that the nephew would serve as a witness for the state. The lawyer recalled that, after reading Smith's letters to his nephew, he had not seen how additional time would have mitigated the nephew's damaging testimony. Thus, he dealt with the evidence through cross-examination of the nephew, eliciting his admission that he had forwarded Smith's letters to curry favor with the district attorney in a county where he was facing charges. The strategic manner in which trial counsel dealt with the evidence did not show deficient performance, but was within the realm of reasonable professional judgment.[57]

(i) Smith argues that his trial lawyer performed deficiently by failing to object to several statements made during the state's closing argument.

(i) Smith asserts that the prosecutor made an impermissible "golden rule" argument,[58] citing the italicized remarks below:

> Most of these cases go undetected because of the shame. And it takes a brave person to go through this. Takes a brave person who's had this happen to them to come around here and take this stand and take an oath and look at you and tell you. . . . She's gone through this because she wants to see the right thing done. She didn't go through this [to earn money for sex]. She didn't go through this for that. She didn't go to the hospital and have the doctors *stick things up in her. And I know we only have a few females on this jury right here, but that type of exam is not one that you like.*[59]

---

[57] See *Fairclough*, supra at 605-606; *Bentley v. State*, 262 Ga. 801 (2) (426 SE2d 364) (1993).

[58] *Braithwaite v. State*, 275 Ga. 884, 885 (2) (b) (572 SE2d 612) (2002) (a golden rule argument is one that, regardless of the nomenclature used, asks the jurors to place themselves in a victim's position).

[59] (Emphasis supplied.)

These comments do not constitute a "golden rule" argument.[60] The record shows that the prosecutor was responding to Smith's defense that R. A. had fabricated allegations. This argument fell within the very wide latitude enjoyed by counsel.[61]

(ii) Smith argues that the prosecutor inappropriately disparaged him as a "sharp predator looking for somebody walking up and down the street." However, this characterization fell within the very wide latitude enjoyed by counsel as a permissible inference drawn from the state's evidence.[62]

(iii) Smith asserts that the prosecutor improperly asked the jurors to consider matters not in evidence when he referenced their own knowledge of Boxankle Road. Smith cites:

Now, during voir dire, I know — and I think we've got some folks that are on this panel that know where Boxankle Road is. In fact, I think I know some folks that are here that in this town that live on some streets before Boxankle Road. The defendant said yesterday he drove three miles, and then he took a left on Boxankle Road, and that's when he first saw [R. A.]. He made a wrong turn and he wanted to correct it. He drove three miles. There's a few other turns he could have turned into if he made a wrong turn before he drove all the way down that way.

"[T]he law forbids . . . the introduction into a case, by way of argument, of facts not in the record and calculated to prejudice the accused."[63] Smith's trial lawyer testified at the motion for new trial hearing that he extended the prosecutor some latitude during the state's closing argument, but only to the extent that he would be able to deal effectively with that argument in the defense's subsequent (and final) closing argument.[64] Because Smith has shown no reasonable probability that he was prejudiced by the cited remarks, we

---

[60] Cf., e.g., *Moore v. State*, 280 Ga. App. 894, 896-897 (3) (635 SE2d 253) (2006).

[61] See *Head v. State*, 276 Ga. 131, 135 (6) (575 SE2d 883) (2003) (counsel enjoys very wide latitude in closing arguments, and may make use of well-known historical facts and illustrations, so long as he does not make extrinsic or prejudicial statements that have no basis in the evidence).

[62] See *Payne v. State*, 273 Ga. 317, 318 (4) (540 SE2d 191) (2001) (counsel in closing argument is entitled to draw reasonable and legitimate inferences from the evidence); *Simmons v. State*, 266 Ga. 223, 228 (6) (b) (466 SE2d 205) (1996) (state's unflattering characterizations of defendant, that he was a liar, that he cried false tears at trial, that he was mean, and that he was a wife beater were permissible inferences drawn from the evidence presented).

[63] *Simmons v. State*, 174 Ga. App. 171, 177 (12) (329 SE2d 312) (1985) (citations and punctuation omitted).

[64] The record shows that defense counsel gave the final closing argument.

conclude that his lawyer's strategic decision not to object fell within the wide range of reasonable professional conduct.[65]

(j) Smith contends that his trial lawyer should have requested a charge on sodomy, as a lesser included offense to aggravated sodomy. "Where the evidence shows either the commission of the completed offense as charged, or the commission of no offense, the trial court is not required to charge the jury on a lesser included offense."[66] Smith's trial lawyer testified at the new trial hearing that he did not request such a charge on sodomy because he believed that sodomy between consenting adults had been struck down.

In *Powell v. State*,[67] the Supreme Court of Georgia held that insofar as OCGA § 16-6-2 "criminalizes the performance of private, unforced, non-commercial acts of sexual intimacy between persons legally able to consent," it unconstitutionally infringed upon the right to privacy.[68] Subsequently, the Court clarified, "[*Powell*] did not hold that the right to privacy protected sodomy generally."[69]

Smith's defense and testimony in support thereof showed circumstances outside those contemplated by *Powell*.[70] The state's evidence supported a finding that Smith was guilty of aggravated sodomy; Smith's testimony (that the sexual activity was not with force, but with R. A.'s consent and in exchange for money) supported a finding that he was guilty of sodomy. Accordingly, Smith has shown that he would have been entitled to a charge on sodomy had his trial lawyer so requested.

Smith claims prejudice, asserting that had his trial lawyer requested an instruction on sodomy, there is a reasonable probability that the outcome of his trial would have been different because the jury would have found him guilty of sodomy and not guilty of aggravated sodomy. Given the evidence, we disagree.

R. A.'s testimony provided evidence that the sodomy was "with force and against [her] will."[71] Her testimony was supported by medical evidence that she had recently sustained physical injuries, in addition to her demeanor as interpreted by her roommate, the sexual assault investigator, and treating emergency medical personnel. R. A.'s testimony was further corroborated by evidence of Smith's own actions. The store receipt Smith handed to the investigator

---

[65] See *Goldey v. State*, 289 Ga. App. 198, 201 (2) (e) (656 SE2d 549) (2008).

[66] *Johnson v. State*, 275 Ga. App. 21, 24 (6) (619 SE2d 731) (2005) (citation and punctuation omitted).

[67] 270 Ga. 327 (510 SE2d 18) (1998).

[68] Id. at 336 (3).

[69] *Howard v. State*, 272 Ga. 242, 243 (1) (527 SE2d 194) (2000).

[70] See id. at 243-244 (1), (2).

[71] OCGA § 16-6-2 (a) (2).

under his initial claim of alibi showed instead only, at best, that Smith was in another town approximately 30 minutes after his encounter with R. A. ended. There was also evidence that Smith abandoned his job without notice and left his nephew stranded in Forsyth, which authorized a finding that Smith was fleeing. The jury observed Smith during the police interview deny that he knew R. A. and deny that he had engaged in any sexual activity with any woman in Forsyth. The jury also heard that subsequent DNA testing refuted Smith's denials. The state showed that Smith unsuccessfully solicited his nephew to corroborate his trial defense that his encounter with R. A. had been without force and with her consent. Given the evidence against Smith, we find no reasonable probability that, but for his trial lawyer's failure to seek an instruction on sodomy, Smith would not have been found guilty of aggravated sodomy.[72]

(k) Smith complains that his trial lawyer failed to redact from his videotaped police interview the investigator's passing remark that he was not going anywhere because he had outstanding warrants. The record shows that immediately after the videotape was played, the defense counsel requested and the trial court gave a cautionary instruction for the jury to disregard the investigator's remark concerning such warrants. This complaint does not amount to a showing of ineffective assistance of counsel.[73]

(l) Smith asserts that his trial lawyer's failure to make certain arguments at his initial sentencing hearing resulted in illegal sentencing, which he acknowledges was later corrected. This complaint is therefore moot.

*Judgment affirmed. Barnes, C. J., and Johnson, P. J., concur.*

DECIDED NOVEMBER 19, 2008.

*Haygood, Lynch, Harris, Melton & Watson, Jehan Y. El-Jourbagy*, for appellant.

*Richard Milam, District Attorney, Mark S. Daniel, Assistant District Attorney*, for appellee.

---

[72] See generally *Edwards v. State*, 264 Ga. 131, 133 (442 SE2d 444) (1994) (no reversible error occurred where it was highly probable that the erroneous failure to give an instruction on lesser included offense did not contribute to the verdict); *Stroud v. State*, 284 Ga. App. 604, 618 (3) (h) (644 SE2d 467) (2007).

[73] See *Smith v. State*, 270 Ga. 68, 70 (3) (508 SE2d 145) (1998).