**SECOND DIVISION**
**MILLER, J.,**
**BRANCH and RICKMAN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**January 26, 2016**

# In the Court of Appeals of Georgia

A15A1640. AUSTIN v. THE STATE.

BRANCH, Judge.

Following a bench trial, James Austin, Jr., was convicted of stalking and criminal trespass. He appeals on the ground that the evidence was insufficient to support the convictions. We affirm.

> When evaluating the sufficiency of evidence, the proper standard for review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). This Court does not reweigh evidence or resolve conflicts in testimony; instead, evidence is reviewed in a light most favorable to the verdict, with deference to the [trier of fact's] assessment of the weight and credibility of the evidence.

*Mickens v. State*, 277 Ga. 627, 627-628 (593 SE2d 350) (2004) (citations omitted).

Viewed in the light most favorable to the verdict, the evidence presented at trial established that the victim and Austin met, perhaps as early as mid 2011, and became friends who saw each other at karaoke bars one to three times a week, usually with others present, but that the friendship never became a romantic, intimate or dating relationship. From the time they met until the time the victim ended their friendship, a period of perhaps two years, the victim only asked Austin to come inside her home on one occasion, when she accepted Austin's offer to give her a television and he delivered it to her home. On one other occasion, she allowed him to drive her home in her car when she was unable to drive; on that occasion, another person followed in a separate vehicle and picked Austin up after everyone arrived at the victim's home.

But at some point in their friendship, Austin began to call the victim at times that she had asked him not to call, to speak hostilely during phone calls, and to leave hostile messages. For example, Austin behaved like a jealous boyfriend when he learned that the victim had spent time with another male friend after Austin left one of the karaoke bars where the victim had been. Austin also became upset with the victim, who had always told Austin that she did not allow men in her house and did not get in cars with other people, when he somehow learned that the victim had

ridden with another man to go to a Waffle House; Austin called multiple times when the victim was still in the car with her other friend, leaving "crazy messages," and when the victim eventually answered the phone, Austin "blew up" at her. Austin also became upset with the victim when she would not let him come to her home to install a modem that he had obtained for her without any request from her; the victim described Austin on that occasion as getting "really out of control." The victim also caught Austin outside her house on one occasion and told him that he had no business being there. On another occasion, after hearing her doorbell ring but finding no one there, the victim saw Austin's car driving away and found a container of chicken wings and an alcoholic drink near the door. And Austin once left an umbrella at her front door, apparently because of rainy weather. On these and other occasions, the victim told Austin that he should not be doing these things and should not be coming to her house.

The victim did accept Austin's offer to help her with computer issues, but she only agreed to bring her computer and meet Austin at locations other than her home to do so. Things came to a head on July 24, 2013, when the victim had taken the day off and had arranged a meeting with Austin to work on computer issues; before leaving to meet with Austin, the victim was visited by a male friend whom she

3

eventually started dating. Later that day, while the victim was meeting with Austin about her computer at a tavern and after she took a long telephone call, Austin again "blew up" at her; "got really belligerent"; said, "I know what you've been doing all day"; and threw a business card at her. The card proved to be the business card of the victim's visitor friend. The victim said, "this is it" and left, following which Austin left many hostile messages for her, causing her to have to block Austin from her phone and from her Facebook account. At about 10:30 that evening, the victim's dog began acting unusually, and the victim became nervous that Austin was outside and called the police. She told the responding officer what had been happening and told him that she did not want Austin on her property anymore. The officer then made a telephone call to Austin, who confirmed his identity, and gave Austin a criminal trespass warning. Specifically, the officer told Austin that the victim did not want him back on the property and that if he came back after the warning, there would be possible legal repercussions. Austin responded that he understood.

Michael Keller, the victim's next door neighbor, testified that he saw Austin and his vehicle at or near the victim's property on at least two occasions, at least one of which was after the issuance of the trespass warning. A month or more prior to Austin's arrest, Keller saw Austin walking down the side of Keller's house and asked

4

what his business was. Austin replied that he was the cable installation man looking for the junction box. Keller challenged Austin's story and asked him to get off his property and leave, which Austin did. Then on August 30, 2013, Keller came home at midnight or later and saw Austin's vehicle parked in the street and saw Austin on the victim's property near the front windows to her home. Austin then started to walk toward Keller, and Keller asked him what he was doing. Austin replied, "it's none of your business," but Keller responded that it was because it was his neighborhood. Austin then said that he was "cheating," which he explained meant that he was visiting the victim because her husband worked at night. Keller went back to his house but had second thoughts and returned to the victim's home while Austin was still sitting in his vehicle. Keller knocked on the victim's door and asked her if she knew the person in the vehicle; when the victim went outside and saw that it was Austin, she became frightened and called the police. Austin was still near the property when the police arrived. In the ensuing conversation with the officer, Austin asked if the officer was the same officer that issued the criminal trespass warning. Austin also claimed that the victim had called him to come over, but he was unable to produce a call log on his cell phone showing the victim's telephone number. Finally, Austin told the officer that this was the third time that he had come back to the

5

victim's property since receiving the criminal trespass warning; he stated that on the previous two nights, he had parked for 20 to 30 minutes but when he did not see the victim, he left.

Austin was arrested for criminal trespass, stalking, and loitering or prowling. He pled not guilty, and his case proceeded to a bench trial where he was convicted of criminal trespass and stalking but acquitted of loitering or prowling. He was sentenced to 24 months with three to serve.

1. Stalking includes spying on a person without their consent:

> A person commits the offense of stalking when he or she follows, places under surveillance, or contacts another person at or about a place or places without the consent of the other person for the purpose of harassing and intimidating the other person.

OCGA § 16-5-90 (a) (1). Under this statute, "harassing and intimidating" means

> a knowing and willful course of conduct directed at a specific person which causes emotional distress by placing such person in reasonable fear for such person's safety or the safety of a member of his or her immediate family, by establishing a pattern of harassing and intimidating behavior, and which serves no legitimate purpose.

Id. And the term "course of conduct" dictates that a pattern of behavior must be shown, *Autry v. State*, 306 Ga. App. 125, 127 (701 SE2d 596) (2010) (footnote

6

omitted), but such a pattern may include the prior history between the parties. *Louisyr v. State*, 307 Ga. App. 724, 729 (1) (706 SE2d 114) (2011). Finally,

> [a] defendant need not engage in unequivocally hostile conduct or make explicit threats in order to be convicted of stalking. Even behavior that is not overtly threatening can provide the requisite degree of intimidation and harassment if it is ongoing, repetitious, and engaged in despite the communicated wishes of the victim.

*Placanica v. State*, 303 Ga. App. 302, 304 (693 SE2d 571) (2010) (footnote omitted).

Here, the evidence shows that Austin repeatedly returned to the victim's home despite her admonitions to stop and that he did so more than one time after receiving the criminal trespass warning. He was seen in her yard in front of her windows, and he admitted parking in front of her home at least twice for 20 or 30 minutes, incidents that occurred after the warning and without the victim's consent. He also repeatedly sent her angry messages. Austin's unceasing attempts to watch, communicate with, or harass the victim clearly placed her in emotional distress sufficient to place her in fear for her safety. "Notwithstanding a defendant's claims of innocent motives, it is for the finder of fact to determine whether the defendant acted with the requisite degree of criminal intent in engaging in the act for which he is prosecuted." *Krepps v. State*, 301 Ga. App. 328, 329 (1) (687 SE2d 608) (2009) (footnote omitted). The

7

evidence presented by the State therefore was sufficient to convict Austin of stalking. See id. (evidence sufficient to support stalking conviction where defendant repeatedly called victim without the victim's consent for the purpose of harassing and intimidating him).

2. The same evidence was sufficient to support the conviction of criminal trespass.

> "A person commits the offense of criminal trespass when he or she knowingly and without authority: . . . (2) Enters upon the land or premises of another person . . . after receiving, prior to such entry, notice from the owner, rightful occupant, or, upon proper identification, an authorized representative of the owner or rightful occupant that such entry is forbidden."

OCGA § 16-7-21 (b). Austin's only argument is that the State failed to present evidence that he entered the victim's property without authority or that he received proper notice that his entry was forbidden.

But construed in favor of the verdict, the evidence shows that the victim told Austin that he had no business coming to her property and that she gave instruction to the officer on July 24, 2013, to tell Austin not to come on her property. The evidence also shows that Austin received the message from the officer but that he

later appeared on the victim's property in front of her window. The only argument raised by Austin — that the victim did not authorize the officer to tell Austin to stay away from her property — ignores the standard of review, which dictates that the evidence be construed in favor of the verdict. For the reasons shown, the evidence was sufficient to support the verdict for criminal trespass.

*Judgment affirmed. Miller and Rickman, JJ., concur*.