**FOURTH DIVISION**
**DILLARD, C. J.,**
**RAY and SELF, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**January 26, 2018**

# In the Court of Appeals of Georgia

A17A1881. KAUFMAN v. THE STATE.

DILLARD, Chief Judge.

Following trial, a jury convicted Christopher Kaufman of three counts of stalking, two counts of criminal trespass, five counts of engaging in harassing communications, eleven counts of criminal attempt to commit a misdemeanor by violation of a protective order, and one count of violation of a protective order. On appeal, Kaufman challenges the sufficiency of the evidence supporting two of his stalking convictions. He further argues that the trial court erred in denying his motion in arrest of judgment as to the same two stalking convictions, based on alleged defects in the accusation, and in denying his claims of ineffective assistance of counsel. For the reasons set forth *infra*, we affirm.

Viewed in the light most favorable to the jury's verdict,[1] the evidence shows that S. Z. met Kaufman in 2011, while she was attending Kennesaw State University, and the two started dating that same year. Shortly thereafter, S. Z. and Kaufman began cohabitating and ultimately had a child together. But less than a year later, their relationship began to sour as Kaufman would belittle S. Z. and frequently lose his temper with her. Over the course of next year or so, Kaufman's poor treatment of S. Z. escalated, as he verbally and physically abused her and forced her to engage in sexual intercourse. During this time, S. Z. made several attempts to end their relationship, but Kaufman refused to accept her pleas and told S. Z. that things would only become worse if she called the police.

In 2014, although S. Z. was still scared of Kaufman, she permanently ended the relationship and moved in with her parents in their Canton home. Nevertheless, Kaufman continued contacting S. Z., incessantly calling her and sending her text messages, often requesting visitation with their son as a means of maintaining contact. On a few occasions, S. Z. agreed to let Kaufman see their child, but when she conditioned that any meetings occur at a public place, such as a restaurant, rather than

---

[1] *See, e.g.*, *Powell v. State*, 310 Ga. App. 144, 144 (712 SE2d 139) (2011).

her parents' home, Kaufman would become angry. And at some point within this time frame, Kaufman told S. Z. that if she ever started dating someone else, he would kill that person and her.

In January 2016, Kaufman was apparently homeless, but he continued to show up at S. Z.'s parents' home without invitation or notice. In one instance, S. Z. and her mother reluctantly agreed to allow Kaufman to come to the house to pick up some tools that he had left there and needed for work, but once at the house, Kaufman refused to leave when S. Z. demanded that he do so, and he then threatened to slit S. Z.'s father's throat when he intervened on his daughter's behalf. Eventually, Kaufman left, and S. Z. told him not to return. Nevertheless, over the next several weeks, Kaufman continued to contact S. Z. numerous times every day by calling her and sending text messages to her mobile phone. Alarmingly, some of Kaufman's texts to S. Z. demonstrated that he was tracking her movements. Additionally, the tone of Kaufman's messages became increasingly angrier when S. Z. attempted to ignore them.

On February 11, 2016, S. Z. filed a report with the Cherokee County Sheriff's Office regarding Kaufman's actions. Specifically, she reported that Kaufman was stalking her and watching her from the woods near her parents' home. The next day,

Kaufman went to S. Z.'s home while she was not there, dropped off some laundry, and admitted to her that he had done so, via a text, despite having been told not to return. An investigator contacted S. Z. a few days later and encouraged her to obtain a protective order against Kaufman, but she expressed a reluctance to do so for fear that he would retaliate.

In the early morning hours on February 27, 2016, Kaufman made repeated attempts to contact S. Z., via text message, and when S. Z. returned to her parents' home from running some errands just before noon, she saw Kaufman near the garage. Frightened, S. Z. backed her vehicle out of the driveway and called her mother, who in turn contacted law enforcement to report Kaufman's presence. Two deputies responded, found Kaufman a few blocks away from the home, walking toward a nearby Waffle House, and issued him a warning for criminal trespass. Afterward, the deputies forwarded their report of the incident to the investigator who S. Z. had initially contacted, and he called S. Z. to schedule a follow-up meeting. But a few days before her scheduled meeting with the investigator, S. Z. was inspecting the interior of a horse trailer on her parents' property that she was trying to sell, when she

4

found a sleeping bag and a Waffle House cup. Immediately, she called the investigator, who responded to the scene and canvassed the area looking for Kaufman. Unable to find him at that time, the investigator left his card at the nearby Waffle House and requested that the employees have Kaufman contact him if he returned there.

Two days later, on March 3, 2017, Kaufman called the investigator from the Waffle House, and the investigator dispatched deputies to the restaurant to arrest him. The deputies then transported Kaufman to the investigator's office to be interviewed, and during that interview, Kaufman admitted to placing the sleeping bag inside S. Z.'s horse trailer. Following the interview, deputies transported Kaufman to the Cherokee County Detention Center. But despite being incarcerated, Kaufman continued his attempts to contact S. Z., placing more than 60 phone calls to her from the detention center's telephones until March 7, 2016, when detention center personnel, after being alerted by S. Z., blocked his ability to call her number.

On March 14, 2016, while still incarcerated, Kaufman sent S. Z. a letter, in which he expressed remorse and his continued love for her but also blamed her for the issues they were having. Finding the letter intimidating, S. Z. provided it to the

investigator, who subsequently obtained additional criminal warrants against Kaufman. Undaunted, Kaufman sent S. Z. another letter nearly one month later, and then a third on May 9, 2016. S. Z. found the letters frightening and forwarded both of them to the investigator. She then obtained an ex parte protective order, and a law-enforcement officer served Kaufman with the order at the detention center. Shortly thereafter, S. Z. obtained a twelve-month protective order, which was then similarly served on Kaufman by an officer.

Yet despite these two protective orders, Kaufman did not cease his efforts to contact S. Z., with records from the detention center indicating that he continued trying to call her phone number from detention center telephones even though her number had been blocked. In addition, on July 31, 2016, one week before Kaufman's scheduled trial, S. Z. received a text message from a phone number she did not recognize but which she believed, based on the content, was sent to her at Kaufman's behest. Ultimately, the investigator determined that the text message was sent from the daughter of one of Kaufman's cellmates. And indeed, during an interview, the inmate admitted that Kaufman requested that he relay a message to S. Z.

Thereafter, the State charged Kaufman, via accusation, with three counts of stalking, two counts of criminal trespass, five counts of engaging in harassing communications, eleven counts of criminal attempt to commit a misdemeanor by violation of a protective order, and one count of violation of a protective order. The case then proceeded to trial, during which the aforementioned evidence and multiple exhibits, including Kaufman's text messages and letters to S. Z., were admitted. And at the conclusion of the trial, the jury found Kaufman guilty on all counts in the accusation. Immediately following the jury's verdict, Kaufman moved in arrest of judgment as to the stalking charges in Counts 2 and 3 of the accusation, arguing that the accusation was defective as to those counts. But the trial court denied the motion.

Kaufman subsequently obtained new counsel and filed a motion for new trial, in which he argued, *inter alia*, that his trial counsel rendered ineffective assistance. The trial court conducted a hearing on the motion, during which Kaufman's trial counsel testified regarding his handling of the case. At the conclusion of the hearing, the trial court denied Kaufman's motion from the bench, and shortly thereafter, it issued an order to that effect. This appeal follows.

1. Kaufman contends that the evidence was insufficient to support his convictions on the charges of stalking. We disagree.

When a criminal conviction is appealed, the evidence must be viewed in the light most favorable to the verdict, and the appellant no longer enjoys a presumption of innocence.[2] And, of course, in evaluating the sufficiency of the evidence, "we do not weigh the evidence or determine witness credibility, but only determine whether a rational trier of fact could have found the defendant guilty of the charged offenses beyond a reasonable doubt."[3] Thus, the jury's verdict will be upheld so long as "there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case."[4] With these guiding principles in mind, we turn now to Kaufman's specific claim of error.

Under OCGA § 16-5-90 (a) (1), "[a] person commits the offense of stalking when he or she follows, places under surveillance, or contacts another person at or about a place or places without the consent of the other person for the purpose of

---

[2] *See English v. State*, 301 Ga. App. 842, 842 (689 SE2d 130) (2010).

[3] *Jones v. State*, 318 Ga. App. 26, 29 (1) (733 SE2d 72) (2012) (punctuation omitted); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

[4] *Miller v. State*, 273 Ga. 831, 832 (546 SE2d 524) (2001) (punctuation omitted); *accord Westbrooks v. State*, 309 Ga. App. 398, 399-400 (1) (710 SE2d 594) (2011).

harassing and intimidating the other person. . . ."[5] Under this same statute, "contact" means

> any communication including without being limited to communication in person, by telephone, by mail, by broadcast, by computer, by computer network, or by any other electronic device; and the place or places that contact by telephone, mail, broadcast, computer, computer network, or any other electronic device is deemed to occur shall be the place or places where such communication is received. . . .[6]

Additionally, OCGA § 16-5-90 (a) (1) provides that "harassing and intimidating" means "[a] knowing and willful course of conduct directed at a specific person which causes emotional distress by placing such person in reasonable fear for such person's safety or the safety of a member of his or her immediate family, by establishing a pattern of harassing and intimidating behavior, and which serves no legitimate purpose. . . ."[7] And this Court has held that the phrase "course of conduct" dictates that "a pattern of behavior must be shown, but such a pattern may include the prior

---

[5] *See* OCGA § 16-5-90 (a) (1).

[6] *See id*.

[7] *See id*.

9

history between the parties."[8] Importantly, a defendant need not engage in "unequivocally hostile conduct or make explicit threats in order to be convicted of stalking."[9] In fact, even behavior that is not "overtly threatening can provide the requisite degree of intimidation and harassment if it is ongoing, repetitious, and engaged in despite the communicated wishes of the victim."[10]

Here, as previously discussed, the evidence shows that S. Z. unequivocally demanded that Kaufman stay away from her parents' home, where she lived, but he repeatedly returned there despite S. Z.'s admonitions and a criminal-trespass warning from law-enforcement officers. In addition, Kaufman incessantly called and sent text messages to S. Z. on her mobile phone, becoming increasingly angrier the longer she tried to ignore such contact. Moreover, the content of many of those calls and messages indicated that Kaufman was tracking S. Z.'s movements. Furthermore, even after Kaufman was arrested, he sent S. Z. three separate letters and attempted to call her more than 60 times using the detention center's phones. And as S. Z. testified,

---

[8] *Austin v. State*, 335 Ga. App. 521, 524 (1) (782 SE2d 308) (2016) (citation and punctuation omitted).

[9] *Id.* (punctuation omitted).

[10] *Id.* (punctuation omitted).

Kaufman's unceasing attempts to watch, communicate with, and harass her placed her in emotional distress sufficient to put her in fear for her safety. Finally, although Kaufman argues that his attempts to contact S. Z. were merely expressions of his love and his desire to see his son, "it is for the finder of fact to determine whether the defendant acted with the requisite degree of criminal intent in engaging in the act for which he is prosecuted."[11] Accordingly, the State presented sufficient evidence to support Kaufman's convictions on the charges of stalking.[12]

---

[11] *Krepps v. State*, 301 Ga. App. 328, 329 (1) (687 SE2d 608) (2009) (punctuation omitted); *accord Austin*, 335 Ga. App. at 525 (1); *see Patterson v. State*, 284 Ga. App. 780, 784 (4) (b) (645 SE2d 38) (2007) (holding that it was for a jury to determine whether defendant's attempts to contact the victim were intended to harass and intimidate her).

[12] *See Austin*, 335 Ga. App. at 524-25 (1) (holding that evidence was sufficient to support defendant's stalking convictions when defendant repeatedly returned to victim's home despite her admonitions to stop, including doing so more than one time after receiving a criminal-trespass warning from police, and repeatedly sent victim angry messages, which made victim fear for her safety); *Placanica v. State*, 303 Ga. App. 302, 303-04 (693 SE2d 571) (2010) (holding that evidence supported conviction for stalking when it showed that, after victim "screamed" at defendant to "leave her alone," defendant persisted in making unwanted contact with victim by showing up at her gym, sending her "tons of text messages," all of which made victim fear defendant); *Krepps*, 301 Ga. App. at 329 (1) (holding that evidence was sufficient to support stalking conviction when defendant repeatedly called victim without the victim's consent for the purpose of harassing and intimidating him); *see also Patterson*, 284 Ga. App. at 784 (4) (b) (holding that evidence was sufficient to support defendant's conviction for aggravated stalking when, despite protective order, he persisted in calling victim, sending her notes, and showing up at her home).

2. Kaufman also contends that the trial court erred in denying his motion in arrest of judgment as to the stalking convictions charged in Counts 2 and 3 of the accusation, specifically arguing that those two counts were fatally defective. Again, we disagree.

It is well established that a motion in arrest of judgment must be "based upon a defect that the accused might otherwise have challenged by a timely general demurrer."[13] Under Georgia law, a general demurrer "challenges the validity of an indictment by asserting that the substance of the indictment is legally insufficient to charge any crime," and it should be granted "only when an indictment is absolutely void in that it fails to charge the accused with any act made a crime by the law."[14] Stated more plainly,

> the true test of the sufficiency of an indictment to withstand a general demurrer is found in the answer to the question: Can the defendant

---

We further note that although Kaufman's challenge to the sufficiency of the evidence focuses solely on his convictions on the charges of stalking, we have reviewed the record and conclude that there was sufficient evidence for the jury to find Kaufman guilty beyond a reasonable doubt of the remaining charges for which he was convicted. *See Jackson*, 443 U.S. at 318-20 (III) (B).

[13] *Lowe v. State*, 276 Ga. 538, 539 (2) (579 SE2d 728) (2003); *accord Poole v. State*, 326 Ga. App. 243, 247 (2) (a) (756 SE2d 322) (2014).

[14] *Poole*, 326 Ga. App. at 247 (2) (a) (punctuation omitted).

admit the charge as made and still be innocent? If he can, the indictment is fatally defective. If the indictment is fatally defective, the sufficiency of the indictment can be questioned by general demurrer or by motion in arrest of judgment.[15]

Furthermore, an indictment is not void if "it is sufficient to place the defendant on notice of the charges against him and enable him to prepare an intelligent defense."[16] And in attacking an indictment after the verdict, "every presumption and inference is in favor of the verdict."[17]

As noted *supra*, OCGA § 16-5-90 (a) (1) provides: "A person commits the offense of stalking when he or she follows, places under surveillance, or contacts another person at or about a place or places without the consent of the other person for the purpose of harassing and intimidating the other person. . . ." And in this matter, Count 2 of the accusation alleged that in Cherokee County, Kaufman "did

---

[15] *Id.* at 247-48 (2) (a) (punctuation omitted).

[16] *Robles v. State*, 277 Ga. 415, 421 (10) (589 SE2d 566) (2003) (punctuation omitted); *accord Ashmore v. State*, 323 Ga. App. 329, 332 (2) (746 SE2d 927) (2013).

[17] *Ashmore*, 323 Ga. App. at 332 (2) (punctuation omitted).

unlawfully then and there commit the offense of stalking by contacting [S. Z.], without the consent of said person, for the purpose of harassing and intimidating said person, in violation of OCGA § 16-5-90 contrary to the laws of this State. . . ." Similarly, Count 3 alleged that in Cherokee County, Kaufman "did unlawfully then and there commit the offense of stalking by contacting [S. Z.] via mail, without the consent of said person, for the purpose of harassing and intimidating said person, in violation of OCGA § 16-5-90 contrary to the laws of this State. . . ."

Kaufman argues that Count 2 of the accusation was defective because it alleged neither the means by which he contacted S. Z. nor the place at which he contacted her. And he similarly maintains that Count 3 was defective because it also failed to allege the place where S. Z. received the letter Kaufman sent to her from the detention center. But the law of this state does not "require expression of a charge contained in an indictment, in the verbatim language of the statute."[18] And here, while not verbatim, the allegations in Counts 2 and 3 sufficiently stated the offense of stalking in the terms and language of the statute. Consequently, the accusation was sufficient

---

[18] *Chenault v. State*, 234 Ga. 216, 223 (6) (215 SE2d 223) (1975) (punctuation omitted); *accord Phillips v. State*, 278 Ga. App. 198, 202 (2) (a) (628 SE2d 631) (2006).

14

to put Kaufman on notice of the crimes with which he was charged; and he could not admit the facts as alleged and still be innocent of committing a crime under OCGA § 16-5-90 (a) (1). Indeed, the fact that the place at which he contacted S. Z. was not set forth in either Count and the method by which he contacted her was not stated in Count 2 did not render the accusation insufficient because, as noted,

> [t]he true test of the sufficiency of an indictment is not whether it could have been more definite, but whether it contains the elements of the offense charged, sufficiently informs the defendant of the charges so that he can present his defense without being surprised by the evidence and protects him against another prosecution for the same offense.[19]

Moreover, Kaufman's specific contention as to the manner in which Counts 2 and 3 of the accusation were defective "was more of a special demurrer issue that was

---

[19] *Pulliam v. State*, 309 Ga. App. 477, 480-81 (2) (711 SE2d 21) (2011) (punctuation omitted); *see Poole*, 326 Ga. App. at 248 (2) (a) (holding that indictment alleging the crime of terroristic threats was not fatally defective for failing to specify the "crime of violence" threatened against the victims); *Phillips*, 278 Ga. App. at 201-03 (2) (a) (holding that indictment alleging offense of aggravated stalking and omitting word "intimidating" in alleging purpose with which defendant committed his unlawful acts was not fatally defective because indictment alleged that defendant's acts of contacting victim were "unlawfully" committed and "contrary to laws of State," and, thus, inference was that act was done for purpose of harassment and intimidation).

missed."[20] And importantly, in contrast to a general demurrer, a special demurrer "merely objects to the form of an indictment and seeks more information or greater specificity about the offense charged."[21] But a special demurrer is waived if "not raised before pleading to the merits of the indictment and cannot be raised after conviction by a motion in arrest of judgment."[22] Thus, by failing to timely file a special demurrer, Kaufman "waived his right to seek greater specificity in the form of the indictment, and he cannot now resurrect his challenge to the indictment in the guise of a motion in arrest of judgment."[23]

---

[20] *Poole*, 326 Ga. App. at 248 (2) (a) (punctuation omitted); *see State v. Delaby*, 298 Ga. App. 723, 725-27 (681 SE2d 645) (2009) (noting that defendant filed special demurrer to influencing a witness counts on ground that use of word "intimidation" in indictment was generic and should be defined with greater specificity); *State v. Tate*, 262 Ga. App. 311, 314 (2) (b) (585 SE2d 224) (2003) (finding that defendant filed special demurrer to terroristic threats count on ground that indictment failed "to assert the specific threat alleged to have been made by him").

[21] *Poole*, 326 Ga. App. at 249 (2) (a) (punctuation omitted); *accord State v. Wilson*, 318 Ga. App. 88, 92 (1) (732 SE2d 330) (2012).

[22] *Poole*, 326 Ga. App. at 249 (2) (a) (punctuation omitted); *accord Wilson*, 318 Ga. App. at 92 (1).

[23] *Poole*, 326 Ga. App. at 249 (2) (a); *see McDaniel v. State*, 298 Ga. App. 558, 559-60 (680 SE2d 593) (2009) (holding that the defendant's failure to file a timely special demurrer seeking additional information constituted a waiver of the right to be tried on a perfect indictment).

Furthermore, even if we were to concede (for the sake of argument) that Counts 2 and 3 of the accusation lacked adequate specificity, "[t]o prevail on a claim that the indictment failed to give adequate notice and thereby worked a substantial denial of due process, [Kaufman] was required as well to show prejudice."[24] But at the trial in this matter, Kaufman's defense was not a denial that he made repeated attempts to contact S. Z. Rather, as he notes in his challenge to the sufficiency of the evidence, the primary defense was that his attempts to contact S. Z. were not for purposes of intimidation or harassment but were based on his expressions of love and a desire to see his son. And had the jury accepted that defense, it would have been effective against all of the stalking charges. Accordingly, Kaufman has failed to show that he was prejudiced by the alleged lack of specificity in the accusation.[25]

---

[24] *Hill v. Williams*, 296 Ga. 753, 758-59 (770 SE2d 800) (2015); *see Russell v. United States*, 369 U.S. 749, 763 (82 SCt 1038, 8 LE2d 240) (1962) ("Convictions are no longer reversed because of minor and technical deficiencies which did not prejudice the accused." (citation omitted)).

[25] *See Hill*, 296 Ga. at 759-60 (holding that defendant failed to show any prejudice sufficient to make out his claim in habeas that indictment failed to give adequate notice that he could be convicted at trial of the statutory rape, in addition to forcible rape and child molestation, of child victim when his actual defense trial was that he had no sexual relations with victim whatsoever).

3. Finally, Kaufman contends that the trial court erred in denying his claims of ineffective assistance of counsel. Once again, we disagree.

In evaluating Kaufman's enumerated claims that his trial counsel rendered constitutionally ineffective assistance, we apply the two-pronged test established in *Strickland v. Washington*,[26] which requires Kaufman to show that his trial counsel's performance was "deficient and that the deficient performance so prejudiced him that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different."[27] Additionally, there is a strong presumption that trial counsel's conduct falls within the broad range of reasonable professional conduct, and a criminal defendant must overcome this presumption.[28] In applying the second prong, the question is whether "there exists a reasonable probability that, but for his

---

[26] 466 U.S. 668 (104 SCt 2052, 80 LE2d 674) (1984).

[27] *Chapman v. State*, 273 Ga. 348, 349-50 (2) (541 SE2d 634) (2001); *see Strickland*, 466 U.S. at 687 (III); *Ashmid v. State*, 316 Ga. App. 550, 556 (3) (730 SE2d 37) (2012).

[28] *Chapman*, 273 Ga. at 350 (2); *see Cammer v. Walker*, 290 Ga. 251, 255 (1) (719 SE2d 437) (2011) ("A claim of ineffective assistance of counsel is judged by whether counsel rendered reasonably effective assistance, not by a standard of errorless counsel or by hindsight." (punctuation omitted)).

18

counsel's errors, the jury would have had reasonable doubt regarding appellant's guilt, that is, but for counsel's unprofessional errors, the result of the proceeding would have been different."[29] And unless clearly erroneous, this Court "will uphold a trial court's factual determinations with respect to claims of ineffective assistance of counsel; however, a trial court's legal conclusions in this regard are reviewed *de novo*."[30] Bearing this analytical framework in mind, we turn now to Kaufman's specific claims.

(a) *Failing to Exclude Improper Character Evidence.* Kaufman contends that his counsel rendered ineffective assistance by failing to adequately review all of the State's evidence, failing to file a pre-trial motion to exclude evidence showing that Kaufman had recently completed first-offender probation, and then failing to move for a mistrial when such evidence was presented to the jury. We disagree.

At trial, during the testimony of the primary investigator, the State submitted and played a video recording of the investigator interviewing Kaufman following his

---

[29] *Ashmid*, 316 Ga. App. at 556 (3) (punctuation omitted); *Strickland*, 466 U.S. at 694 (III) (B).

[30] *Sowell v. State*, 327 Ga. App. 532, 539 (4) (759 SE2d 602) (2014).

arrest. During the interview, Kaufman began to discuss the fact that he was on first-offender probation, but before any further details were revealed, the State stopped the recording, and a bench conference ensued outside the presence of the jury. Kaufman objected that the reference to his probation status had improperly put his character into evidence. The State's prosecutor agreed that the reference to Kaufman's probation status on the interview in the recording should not have been played. Nevertheless, she claimed that the revelation was the result of an innocent oversight, explaining that two separate recordings existed and that while the second recording contained several references to Kaufman's criminal history and probation status, she and Kaufman's counsel had agreed to only show the first recording and that this second recording would not be played. Unfortunately, as the State's prosecutor further explained, she had not realized that this first recording also contained a passing reference to that probation status.

During the bench conference, Kaufman's trial counsel corroborated the prosecutor's explanation and admitted that he also had not realized that the first recording contained a reference to Kaufman's probation status. Defense counsel then moved for a mistrial. But after further discussion with the trial court, which indicated

it was not inclined to grant a mistrial, and Kaufman himself, trial counsel agreed that a curative instruction would be sufficient. Subsequently, the trial court brought the jury back in to the courtroom, admonished the State for not redacting the reference to Kaufman's first-offender probation, and instructed the jury to disregard the comment entirely. The trial court concluded its instruction by asking the jurors if any of them would have difficulty disregarding the comment. And when one juror admitted that he would, in fact, find it difficult, the trial court and both parties agreed that once both parties rested, that particular juror would be designated as an alternate and would not participate in deliberations.

Kaufman now argues that his trial counsel rendered ineffective assistance by failing to file a motion to exclude the reference to Kaufman's first-offender probation and then failing to seek a mistrial after this improper character evidence was presented to the jury. But as noted *supra*, both the State's prosecutor and Kaufman's trial counsel were unaware that the recording the State intended to play contained any references to Kaufman's first-offender probation, and trial counsel immediately objected when the evidence was presented. And during the hearing on Kaufman's motion for new trial, his former counsel testified that he did initially seek a mistrial

21

but agreed to a curative instruction based on Kaufman's expressed desire to proceed with the trial and the trial court's apparent disinclination to grant a mistrial. In light of these particular circumstances, trial counsel's failure to seek a mistrial did not constitute deficient performance.[31] Moreover, given the overwhelming evidence of Kaufman appearing at S. Z.'s home without her permission, his repeated phone calls, his incessant sending of text messages, and his letters mailed to S. Z. from the detention center where he was incarcerated, Kaufman "has failed to show a reasonable probability that, but for the alleged errors related to the bad character evidence, the outcome of the trial would have been more favorable to him."[32]

---

[31] *See Smith v. State*, 294 Ga. App. 692, 706 (10) (g) (670 SE2d 191) (2008) (holding that trial counsel did not render ineffective assistance by failing to seek a mistrial as a remedy to witness's passing reference to defendant's criminal history because there was no reasonable probability that trial court would have granted mistrial); *Head v. State*, 288 Ga. App. 205, 208 (2) (653 SE2d 540) (2007) (holding that counsel's failure to request a mistrial did not constitute ineffective assistance because it affirmatively appeared from the record that the trial court in its discretion would have denied the request); *see also Hunter v. State*, 281 Ga. 526, 530 (3) (640 SE2d 271) (2007) (holding that given the trial court's prompt and pointed curative instruction and given that the improper reference was inadvertent, the trial court did not abuse its discretion in denying the motion for mistrial). *See generally Ventura v. State*, 284 Ga. 215, 218 (4) (663 SE2d 149) (2008) ("The failure to pursue a futile objection does not amount to ineffective assistance.").

[32] *Toomer v. State*, 292 Ga. 49, 59 (4) (734 SE2d 333) (2012); *see Armour v. State*, 290 Ga. 553, 556 (2) (c) (722 SE2d 751) (2012) (finding that the "fleeting introduction" of evidence that defendant had been previously arrested on a "gun

(b) *Failure to Object to Victim's Use of Term "Rape."* Kaufman also contends that this trial counsel rendered ineffective assistance by failing to object to S. Z.'s testimony, claiming that Kaufman had raped her during their relationship but prior to the incidents upon which the stalking charges were based. Again, we disagree.

During Kaufman's trial, and as previously noted, S. Z. testified that just prior to permanently ending her relationship with Kaufman, he forced her to engage in sexual intercourse. And in fact, on three separate occasions during her trial testimony, she specifically used the term "rape" when describing Kaufman's actions in this particular regard. Kaufman's trial counsel lodged no objection to any of the instances in which S. Z. characterized Kaufman's conduct as rape. But during the hearing on the motion for new trial, when explicitly asked about this issue, Kaufman's trial counsel testified that it was difficult but that he decided against objecting, stating "[i]f I object saying it's not relevant to the issue and lose, it's disastrous because I have

---

charge" and for giving false information to a police officer did not create "a reasonable probability that the outcome of the trial would have been different, because the charges were never mentioned again during the trial"); *Patterson v. State*, 274 Ga. App. 341, 345 (4) (d) (618 SE2d 81) (2005) (denying ineffective assistance of counsel claim based on failure to request a mistrial for the improper admission of character evidence because of the strength of evidence of the defendant's guilt).

23

then called attention to it and made it an issue. It was my — you know, better to just let it go. . . ."

On appeal, Kaufman argues that trial counsel's failure to object to S. Z.'s testimony claiming that Kaufman had raped her constituted ineffective assistance. But Georgia appellate courts have held that a decision not to object to certain testimony at trial to avoid drawing attention to it—as trial counsel decided here—is a "legitimate trial strategy that falls within the range of reasonable professional conduct."[33] Thus, given the strategic nature of counsel's decision with respect to this evidence, "it can provide no grounds for reversal unless it was so patently unreasonable that no competent attorney would have chosen it."[34] And here, Kaufman did not carry his burden of rebutting the presumption that his trial counsel's decision

---

[33] *Durham v. State*, 292 Ga. 239, 241-42 (4) (a) (734 SE2d 377) (2012) (punctuation omitted); *see Brown v. State*, 321 Ga. App. 765, 768 (2) (743 SE2d 452) (2013) (holding that trial counsel's decision not to object to testimony of defendant's alibi witness referencing defendant's involvement in other robberies, so as to avoid drawing jury's attention to it, was strategic decision and thus would not support claim of ineffective assistance of counsel); *Greenwood v. State*, 309 Ga. App. 893, 895 (1) (a) (714 SE2d 602) (2011) (holding that trial counsel's decision against objecting to improper evidence of defendant's bad character because he wanted to avoid drawing jury's attention to the issue was reasonable trial strategy and did not amount to ineffective assistance of counsel).

[34] *Brown*, 321 Ga. App. at 768 (2) (punctuation omitted).

was reasonable.[35] Accordingly, the trial court did not err in denying Kaufman's claim of ineffective assistance in this regard.

For all these reasons, we affirm Kaufman's convictions and the denial of his motion for new trial.

*Judgment affirmed. Self, J., concurs. Ray, J., concurs in judgment only as to Division 3 (b) and otherwise fully concurs.*

**\* DIVISION 3 (b) OF THIS OPINION IS PHYSICAL PRECEDENT ONLY. COURT OF APPEALS RULE 33.2 (a).**

---

[35] *See id.*